### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### WAL–MART STORES, INC., Respondent.

### No. 73–1246.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1973.

Decided Dec. 4, 1973.

William H. Bruckner, Lincoln, Neb., for respondent.

Marjory Gofreed, Atty. N.L.R.B., Washington, D. C., for petitioner.

Before LAY and BRIGHT, Circuit Judges, and EISELE, District Judge.*

LAY, Circuit Judge.

The sole issue presented is whether there exists substantial evidence on the record as a whole to support the Board's finding that Wal-Mart Stores, Inc., violated §§ 8(a)(1) and (3) of the National Labor Relations Act by discharging an employee, Connie Kreyling, in order to discourage her attempts at unionization of the store.[1]

Wal-Mart operates a chain of discount stores in Arkansas and Mississippi. Corporate headquarters are in Bentonville, Arkansas. In January, 1971, shortly before the opening of the Wal-Mart store in Mexico, Missouri, Connie Kreyling was hired as the office cashier for that store. Her principal duty was to reconcile the store's cash flow. Each day she would count the cash receipts from the previous day, balance the cash registers, fill out bank deposit slips and

---

* G. Thomas Eisele, District Judge for the Eastern District of Arkansas, sitting by designation.

1. Additionally, the Board found that Wal-Mart violated § 8(a)(1) through enforcement of an overly-broad no-solicitation rule. Wal-Mart did not except to this finding and it is conceded that this issue is not now before us.

prepare a daily cash report. She generally finished with the cash report by 2 p. m. The rest of her day was spent on other office work, for example, processing and preparing invoices, filing, helping with the payroll, and preparing monthly charge account statements. She also assisted Judy Overstreet, who was in charge of the service desk, whenever necessary. On Saturdays, after first preparing the daily cash report for Friday, she prepared a weekly cash summary, which was then mailed to the home office. Frequently, Kreyling had to work overtime (an average of 2½ hours per week) to finish her duties.

During the period of her employment, Kreyling received three small wage increases. On January 26, 1972, she and store manager Robert Haines flew to company headquarters for a training session on new office equipment. On the return trip, Haines told her that she was doing an excellent job and that "he was lucky to have found a cashier like [her]." Less than two weeks later, on Monday, February 7, 1972, she was discharged.

In late 1971, Kreyling met with a union organizer to discuss unionizing the Wal-Mart store in Mexico. She subsequently asked other Mexico employees how they felt about a union. The general counsel concedes that there is no evidence indicating that management knew of these conversations. In January, 1972, Kreyling signed a union authorization card. There is no evidence that the company knew of this.

The examiner found that on Saturday, February 5, manager Haines was unusually "rough" on Judy Overstreet. At about 4 p. m. Overstreet told assistant manager Baker (but not Haines) that she was quitting at the end of the day. On that same day Kreyling completed the weekly cash report at approximately 5 p. m., at which time Haines took it to the post office. When he returned, both Overstreet and Kreyling had left work.

Over the weekend, Kreyling told her husband of her unhappiness with Haines' treatment of Overstreet. On Sunday afternoon, with his wife's approval, Mr. Kreyling called five other Mexico employees to tell them of the Overstreet episode. He asked them whether they would be willing to sign union authorization cards. Some of the calls were quite lengthy. There is no direct evidence indicating that management knew of these phone calls.

At about 7:30 a. m. on Monday, February 7, Haines called Overstreet to ask her to return to work (Haines testified that he did not know until he called her that she had decided to quit; he testified that he called simply to ask her to come in early). Overstreet reluctantly told Haines she would be in; immediately thereafter, however, she called Kreyling to say that she was still quitting and asked her to so inform Haines.

Kreyling reported for work at 8 a. m. Monday and was immediately discharged by Haines. He told her that her production had not increased in the last six months and her attitude was poor. Her termination notice was dated Saturday, February 5. Haines told Kreyling that he would give her a good reference wherever she went.

Kreyling had never been specifically informed that her performance was unsatisfactory. She was never given a written reprimand. Four "notices of verbal reprimand" were placed in her file by Haines but she was never told they were there. Kreyling testified she never understood she was being reprimanded.

Haines testified that he had been looking for a replacement for Kreyling for quite some time. He testified to receiving criticism from the home office chiefly because (a) his weekly cash summaries were continually submitted late and (b) his office payroll was running higher than the norm for other Wal-Mart stores. Haines attributed both of these problems to Kreyling's slow production. He said he decided to fire Kreyling on Saturday, February 5, while on his way to the post office to mail the

weekly cash summary, which was again late. When he returned to the store, however, Kreyling had left. He said he wrote her termination notice at that time and planned to give it to her Monday morning.

Kreyling was replaced by Wanda Durham, who had been hired on January 11, 1972, and had received no training as cashier. Haines testified that he hired her with the intention of using her to replace Kreyling.

Notwithstanding the lack of direct evidence establishing management's knowledge of Kreyling's union activities, the administrative law judge found that "Haines learned through some undisclosed source that Mr. Kreyling had called store employees on Sunday * * * and that [Haines] determined to disrupt any possible interest in the Union by immediately discharging the employee responsible, Connie Kreyling." [2]

There exists substantial evidence on the record as a whole to sustain the administrative law judge's finding that the respondent company's avowed reasons for discharging Kreyling were pretextual. With this fact established, we find that it was reasonable for the trier of fact to infer that the company had discharged Kreyling for engaging in union activity. Although there exists no direct evidence of the company's knowledge, it has long been held that the element of knowledge may be proved by circumstantial evidence from which a reasonable inference may be drawn. *See, e. g.,* NLRB v. Long Island Airport Limousine Service Corp., 468 F.2d 292 (2d Cir. 1972); Santa Fe Drilling Co. v. NLRB, 416 F.2d 725 (9th Cir. 1969); NLRB v. Lawson Printers, Inc., 408 F.2d 1004 (6th Cir. 1969).

2. The administrative law judge explained his decision as follows:

I do not believe Haines' story that he decided on the way to the post office Saturday at 5 p. m. to discharge Kreyling because of her work performance. Nothing unusual had happened that day; there was no last straw that suddenly made her alleged unsatisfactory performance intolerable. Haines had never shown any indication that he might take such drastic action as discharge for a condition which he had tolerated without complaint for a year. All in all, I find his stated reason for discharging Kreyling so inadequate and unbelievable as to throw doubt on all his testimony.

Having found that Haines did not decide to fire Kreyling on Saturday, it follows that he filled out her separation notice on Monday morning when he arrived at the store. His telephone call to Overstreet that morning was, I find, not to ask her to come in early but to reconsider her decision to quit, since without her, he would have no experienced office help at all. If Haines had really decided on Saturday to discharge Kreyling, it is unlikely that he would have waited until Monday morning to ask Overstreet to come in early that day, since he could have done it anytime that weekend. I find, however, that Haines learned on Saturday evening from his assistant manager, that Overstreet had quit, and was not disturbed by her decision until he learned over the weekend that he was going to have to discharge Kreyling.

It was only because Overstreet could not be induced to return, that Haines had to fall back on the only employee he had who might be considered at all qualified for the work of office cashier—Wanda Durham. Haines' sudden reliance on Durham was not, I find, planned but was wholly inadvertent. She had been hired as a saleslady, had never been asked to train for an office job, and had never been told that she was being considered for office work at the store. Not even on Saturday, when according to Haines, he had decided to discharge Kreyling, did he ask Durham to transfer to the cashier's job on Monday. I am satisfied that Haines had no intention of using Durham in the office until he unexpectedly found himself with no experienced office workers on Monday morning.

I conclude from the foregoing findings of fact and the inferences I have drawn from them, that Haines learned on Sunday or early Monday morning that Connie Kreyling was thinking and talking about representation of the employees by a union, and that he decided to discharge her only upon learning of her interest in a union. Since the reasons which Haines gave for her discharge seem untrue and wholly [sic] pretextual, I conclude that the real reason she was terminated was to rid the store of a union adherent.

Here the inference is not based purely on speculation. There are several evidential factors the administrative law judge weighed from which an inference of knowledge of union activity can be drawn: (1) Kreyling's long satisfactory work record, (2) the periodic raises given to her, (3) Haines' praise of Kreyling that she was doing "an excellent job" some two weeks before her discharge, (4) the abrupt discharge without prior warning, (5) proof that Kreyling had worked several hours overtime without criticism from Haines, (6) Haines' admission that the quality of her work was good and that "she always got the work out," (7) the timing of the discharge, immediately following Kreyling's and her husband's efforts to interest others in organizing a union, (8) proof of anti-union animus as reflected in statements made shortly after Kreyling's discharge,[3] (9) the pretextual statements by Haines as to why Kreyling was discharged, and (10) the store's location in a "real small town" and a total of only 34 employees within the store.

Where different inferences might be drawn from the evidence, this court cannot, under the standard of review required by the Supreme Court, reach a different result simply because we might disagree with the findings of the Board. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In determining whether there exists substantial evidence on the record as a whole we must view the inherent strengths and weaknesses of the inferences drawn by the Board. Here we think the inference of company motivation and knowledge is a strong one.

Each case must, of course, stand on its own facts. In NLRB v. Century Broadcasting Corp., 419 F.2d 771 (8th Cir. 1969) (Lay, J., dissenting), the majority ruled that the trial examiner's inference of knowledge, drawn from the fact that the company failed to produce any witnesses, was impermissible. In the present case, however, the finding is made from the evidence surrounding the pretextual discharge.

In Amyx Industries, Inc. v. NLRB, 457 F.2d 904 (8th Cir. 1972), this court refused to enforce the Board's finding of a discriminatory discharge for the lack of proof of knowledge. We observed:

> [M]ere coincidence in time between the employee's union activities and his discharge does not raise an inference of knowledge on the part of the employer without some direct or persuasive circumstantial evidence of knowledge. *Id.* at 906.

However, there the evidence did not support a finding of pretextual discharge. In *Amyx* there was substantial evidence that the employee's work had not been satisfactory. Thus, in *Amyx* there was no evidential premise from which to draw an inference of knowledge of union activity other than the examiner's decision not to credit the company's avowed reason for discharge. In the instant case, in addition to the trial judge's refusal to credit Haines' testimony, there exists substantial evidence as set forth earlier which demonstrates that the company's reasons for discharge were pretextual. This we think is the material difference.

The issue is whether knowledge of Kreyling's union activity is a reasonable inference to be drawn from the facts surrounding an obvious pretextual discharge. The fundamental test is whether there is a rational connection between the facts proved and the fact that is to be inferred. We find there is. As the Second Circuit Court of Appeals has observed:

> More important, there is no good reason why the two factual propositions

---

3. After her discharge Kreyling obtained authorization cards and solicited other employees to sign them. On February 24, company representatives openly stated that they "most certainly" did not want a union in the store. On February 24, the union filed a petition with the Board for a representation election. Because of the pendency of the charges in this case, the election has not yet been held.

118

—employer knowledge of general Union activity and employer anti-Union motivation in discharging a particular employee—need be proved by different types of evidence. As to each, direct evidence may not be obtainable and circumstantial evidence and "inferences of probability drawn from the totality of other facts," * * * are perfectly proper.

NLRB v. Long Island Airport Limousine Service Corp., 468 F.2d 292, 295 (2d Cir. 1972).

We conclude on the present record that there was sufficient evidentiary support to sustain the essential elements of a discriminatory discharge under §§ 8(a)(1) and (3) of the Act. See also NLRB v. UNECO, Inc., 433 F.2d 974, 976 (8th Cir. 1970); Sterling Aluminum Co. v. NLRB, 391 F.2d 713, 717 (8th Cir. 1968).

The Board's petition for enforcement of its order is granted.

It is so ordered.