**WEBCO BODIES, INC., d/b/a Webco Pacific, Inc., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1694.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1979.

Decided April 6, 1979.

Timothy L. Stalnaker, of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., argued, and Michael J. Tannler, St. Louis, Mo., on brief, for petitioner.

Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., argued, Lynne E. Deitch, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief, for respondent.

Before HEANEY and McMILLIAN, Circuit Judges, and SCHATZ,* District Judge.

* ALBERT G. SCHATZ, United States District Judge, for the District of Nebraska, sitting by designation.

HEANEY, Circuit Judge.

Webco Bodies, Inc., petitions this Court for review of an order of the National Labor Relations Board. The Board has cross-applied for enforcement of its order. The Board proceeding is published at 237 NLRB No. 197, —— L.R.R.M. —— (1978). We enforce the Board's order.

Webco manufactures custom-designed aluminum truck bodies and mounts them on its customers' chassis. The Company is owned by four stockholders, who are all active in the business.

In January of 1977, a number of Webco's employees discussed the possibility of organizing the plant. On January 31, one of them, Garry Stanfill, contacted the Automotive Petroleum and Allied Industries Employee Union, Local 618. He received several authorization cards from the Union on February 1. On that same day, he went to the homes of two fellow employees. They took cards for themselves and three other employees. Stanfill also passed out three cards to other employees before work and during the lunch break. By February 3, nine of the eighteen employees in the plant had signed cards. Just prior to quitting time that day, the Company called a meeting of all employees and handed the seven employees with the least seniority the following notice:

> Effective 2/3/77 5:30 p. m.
>
> It is with much regret but due to the continuing lack of orders and business conditions in general, the following employees are laid off:
>
> Leroy Simmons
> Gary [sic] Stanfill
> Ernie Deatherage [sic]
> Bryant Disharoon
> Robert Mayfield
> David Heitkamp
> Clinton [sic] Manasco
>
> We do not expect conditions to improve in the foreseeable future and it appears that there is no reasonable expectation that the above listed employees will be called back to work.
>
> Your termination checks are attached.

Six of the seven employees discharged had signed Union authorization cards.

On February 4, the Union filed unfair labor practice charges with the Board, alleging that the seven employees had been discharged for Union activities. On March 4, the Board issued its complaint, charging Webco with violations of § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). A petition for a representation election was filed on February 8 and, on March 23, an election was held. The discharged employees were permitted to vote under protest. Their votes were crucial to the result of the election.

The Board found that the Company had economic justification for reducing the work force, but concluded that it had discharged the employees rather than placing them on temporary layoff status so that they would be ineligible to vote in the anticipated representation election. The Board ordered that the discharged employees be placed on a preferential hiring list in order of their seniority and reinstated to their former positions without prejudice to their seniority or other rights and privileges. It also required Webco to discharge any employees hired after February 3 in order to make room for the discharged employees, and to post appropriate notices.

The basic question before this Court is whether substantial evidence on the record as a whole supports the Board's findings (1) that Webco knew its employees were engaging in Union activities at the time it implemented a reduction in force, and (2) that the Company terminated the employees rather than laying them off because of their Union activities.

██ The facts are largely undisputed. What is at issue are the inferences to be drawn from those facts. We have consistently held that the Board, in reaching its decision, is permitted to draw reasonable inferences and to choose between conflicting views of the evidence. It cannot rely, however, on suspicion, surmise, implications or plainly incredible evidence. If the Board follows these standards, we have no alternative but to affirm its decision. *Mead and*

*Mount Construction Co. v. N. L. R. B.*, 411 F.2d 1154, 1157 & n.9 (8th Cir. 1969).

## KNOWLEDGE

 The Board reasonably inferred that the Company knew that the Union organizing campaign was proceeding from the following facts:

Union activity was carried on openly in a small plant that employed only eighteen persons. A number of employee discussions about the Union occurred during lunch while they were sitting on truck bodies or chassis at the plant. One of the employees involved in the discussions was the brother-in-law of the plant manager. The nature of the Company's operation was such that responsible management officials were continuously in contact with the work force. The plant manager worked closely with the employees and was often in the plant. *See Chauffeurs, Teamsters and Help. Loc. 633, N. H. v. N. L. R. B.*, 166 U.S.App.D.C. 157, 509 F.2d 490 (1974); *Amyx Industries, Inc. v. N. L. R. B.*, 457 F.2d 904 (8th Cir. 1972).

## MOTIVATION

The Board reasonably inferred that Webco discharged the seven employees rather than lay them off because of their Union activities from the following facts:

Webco's vice president in charge of production made statements to a number of employees in late 1976 and early 1977 to the effect that a layoff was unlikely. When John Taylor was hired in mid-1976, Griffin informed him that Webco had enough work to last the rest of 1976 and almost all of 1977. In September of 1976, he told Stanfill that Webco had enough work to keep Stanfill employed for two years. Mayfield was hired in October of 1976 and was told that he could work as long as he wanted the job. David Heitkamp, also hired in 1976, was informed that no layoffs were anticipated. The layoffs were timed to coincide with the Union organizing campaign. *See McGraw-Edison Company v. N. L. R. B.*, 419 F.2d 67 (8th Cir. 1969); *N. L. R. B. v. Harry F. Berggren & Sons, Inc.*, 406 F.2d 239 (8th Cir.), *cert. denied*, 396 U.S. 823, 90 S.Ct. 64,

24 L.Ed.2d 74 (1969). The termination notice was worded in a way to preclude the employees from voting in the anticipated election. In 1975 when the business of Webco dropped off, it temporarily laid off the number of employees necessary to bring its work force into proper balance rather than permanently laying them off. Finally, the Board could find that Webco reasonably anticipated that a large contract for the construction of approximately 105 units would be available for completion in the near future.

In reaching our decision, we are cognizant of the dissenting opinion of two members of the Board. They emphasize the lack of Union animus and the economic necessity for a layoff in their dissent. Had theirs been the prevailing view, we probably would have refused to enforce since the case is a close one. We cannot, however, substitute our judgment for that of the Board.

We enforce the Board's order.