**ALUMBAUGH COAL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Mine Workers of America, Intervenor-Respondent.**

**No. 80–1168.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1980.

Decided Dec. 16, 1980.

William A. Lubbers, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter M. Bernstein, L. Joseph Ferrara, Attys., N. L. R. B., Washington, D. C., for respondent.

Kenneth J. Yablonski, Yablonski, King, Costello & Leckie, Washington, Pa., for intervenor-respondent.

Roger S. Kaplan, Jo-Anne P. Morley, Jackson, Lewis, Schnitzler & Krupman, New York City, for petitioner.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

This case arises on a petition for review by Alumbaugh Coal Corporation and a cross-petition for enforcement of an order of the National Labor Relations Board finding that Alumbaugh violated sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3), and 158(a)(5) (1976), during efforts by the United Mine Workers of America to organize employees at the corporation's strip mining operation in Kantner, Pennsylvania. 247 N.L.R.B. No. 112, 103 L.R.R.M. 1210 (Feb. 6, 1980).

The petition and cross-petition raise three issues for review: (1) whether the Board erroneously refused to dismiss the proceedings against Alumbaugh because a former NLRB attorney participated in the case on the Union's behalf; (2) whether substantial evidence supports the Board's finding that the corporation unlawfully discharged one of its employees, Roger Bouch, and if so, whether he should be granted reinstatement with full backpay in light of his post-discharge misconduct; and (3) whether the Board properly determined that the Union acquired majority status among the employees through signed authorization cards so as to justify the issuance of a bargaining order to the corporation. We grant enforcement of the Board's order except as modified concerning the reinstatement of Bouch with backpay.

## I. *Background.*

Alumbaugh Coal Corporation (the Company), a Minnesota corporation, engages in the strip mining and sale of coal from four leased parcels and one owned tract of land in Kantner, Pennsylvania. Forrest Yoder, a Company employee, and his wife own one of the leased parcels, but they grant to the Company the right to strip and mine the land in return for monthly royalties that totaled $15,388 in 1977.

In late February or early March of 1977, Roger Bouch, a Company truckdriver with a good work record, began to discuss with his coemployees the possibility of unionizing the production and maintenance employees and truckdrivers at the Pennsylvania mine sites. On March 8, Bouch contacted the district office of the United Mine Workers of America (the Union). The Union sent two of its organizers to meet with him at his home, and on April 11 the Union officially authorized an organizational drive at the Company. The next day the two organizers again met with Bouch at his home and obtained signed authorization cards from Bouch and two other employees. The fol-

lowing day Bouch and these employees talked to another employee and obtained his signature card while at work a day later on April 14. By May 2, a total of thirteen employees had signed authorization cards. At that time the Company employed twenty-four production and maintenance employees, including Bouch but excluding Yoder, the lessor-employee.

On April 18, one week after the organizing campaign began, Company President Joseph Method laid off Bouch. According to Method, he told Bouch: "I am going to have to lay you off. I have too many men on the job. As you can see, Worsell's back to work today. You're the last man here and you're going to have to be the one that has to go." At that time, however, Alfred Berkey, who had been hired nine months after Bouch's hire, worked for the Company as a laborer, a lesser skilled position than the one held by Bouch.

Two days after the Company laid off Bouch "for lack of work," Method hired Robert Peterman as a welder, but discharged him the next day after learning from a reference of Peterman's prior criminal record. In early June, Bouch asked Method about the prospects for recall, but Method responded that "nothing had changed" and that the Company "did [not] have any work in sight." A few weeks later, however, the Company hired G. Shifflett as a laborer, bringing its work force up to the same number as when Bouch had been working. The Company never recalled Bouch.

On July 8, the Union filed a petition for a representation election, which it lost on September 7. The Board nullified the election results, however, finding that the Company had committed twenty-five separate violations of section 8(a)(1) during the Union's organizational drive and before the representation election, and that a fair rerun election could not be conducted because of the serious lingering effects of those

violations.[1] Accordingly, the Board issued a bargaining order to the Company retroactive to May 2, the date on which the Union achieved majority status among the mine site employees through signed authorization cards. The Board also found that the Company unlawfully discharged Bouch for engaging in union activities and ordered the Company to offer him reinstatement and backpay.

## II. *Discussion.*

### A. *Dismissal of Proceedings.*

In the proceedings before the administrative law judge, the Company moved to dismiss the unfair labor practice charges on the ground that Ronald Zera, an attorney employed by the Board at its Region 6 office when the Union filed its representation petition, had participated in the case on behalf of the Union after leaving the regional office.[2] The Company argued that Zera's involvement violated the Board's rules[3] and denied it due process of law.

The administrative law judge refused to grant dismissal, reasoning that Zera's minimal participation in the case, even if in violation of Board regulations, in no way prejudiced the Company's substantive rights under the National Labor Relations Act or so tainted the entire proceedings as to deny the Company due process of law. The Board affirmed, and the Company appeals.

Unless required by law, this court will not set aside a Board decision in the absence of a showing that the alleged procedural defect substantially prejudiced the rights of the complaining party. *Curlee Clothing Co. v. NLRB*, 607 F.2d 1213, 1215 (8th Cir.); *NLRB v. Monsanto Chemical Co.*, 205 F.2d 763, 764–65 (8th Cir. 1953). Our review of the record satisfies us that the administrative law judge and the Board adequately examined the relationship of Zera to the agency proceedings and fairly determined Zera's involvement in the case to be nonprejudicial to the Company's rights. *See* note 2 *supra*.

1. The Board found that the Company committed violations of § 8(a)(1) both before and after the Union achieved majority status on May 2. During the period from Bouch's dismissal to the Union's achievement of majority status, the Company conducted coercive interrogation of employees to dissuade them from engaging in union activity; promised to grant pay raises, increase vacation time, and remedy grievances; threatened to close the mine if the Union gained recognition; granted a general wage increase to induce defection from the Union; and requested employees to withdraw their authorization cards. From May 2 to the September representation election, the Company's unfair labor practices included: a second wage increase to induce defection from the Union; threats to either cease operations or discharge employees if the Union won the election; promises of increased pension and profit sharing benefits to persuade employees to oppose the Union; and pledges to improve the Company's medical plan and hospitalization benefits.

   The Company does not contest these violations before this court. It challenges only the Board's findings that it violated §§ 8(a)(3) and 8(a)(5) of the Act by unlawfully discharging Roger Bouch and by refusing to bargain with the Union.

2. Zera had been an employee of the Board on September 13 when the Union filed its objection to Company conduct affecting the results of the representation election. About two weeks later, Zera left the Board to become an associate of Kenneth J. Yablonski, counsel for the charging party.

   The record discloses that Zera participated in the case on the Union's behalf in two instances. Sometime between the date of the election and September 27, he met with two of the Company's employees to discuss the facts of the case. On December 19, as a member of the Yablonski firm, Zera transmitted a letter to the regional office withdrawing some of the Union's objections to the election. There is no evidence in the record that Zera participated in the regional office's investigation of the charge or in the interrogation of witnesses as a Board agent.

3. The relevant regulation provides:

   No person who has been an employee of the Board and attached to any of its regional offices shall engage in practice before the Board or its agents in any respect or in any capacity in connection with any case or proceeding which was pending in any regional office to which he was attached during the time of his employment with the Board. [29 C.F.R. § 102.119 (1979).]

In our judgment, moreover, the Board's determination as to the effect of a technical violation of its rules should not be lightly overturned. Considerations of procedural fairness to a litigant must be balanced against the severe impact of dismissal on the parties' substantive rights and the public's interests under the Act. Absent an abuse of discretion, that determination falls particularly within the Board's jurisdiction and expertise. The Company's failure to demonstrate substantial prejudice to its rights persuades us that the Board did not abuse its discretion in refusing to dismiss the proceedings.

B. *Discharge and Reinstatement of Bouch.*

1. *Discharge.*

To uphold the Board's determination that the Company unlawfully discharged Bouch, we must find substantial evidence on the record as a whole that the Company had knowledge of Bouch's union activities before the layoff occurred. *NLRB v. Ace Comb. Co.,* 342 F.2d 841, 848 (8th Cir. 1965) ("It is, of course, impossible for a discharge to be discriminatory without knowledge on the part of the employer of the employee's Union activities."); *accord, Webco Bodies, Inc. v. NLRB,* 595 F.2d 451, 453–54 (8th Cir. 1979). General Counsel for the Board admitted to the administrative law judge that "there is less than direct evidence of the Employer's knowledge of Bouch's union activity on the date of his layoff," but argued that such knowledge could be inferred by application of the "small plant doctrine" to the circumstances of this case.

▋ The Board has long held that an employer's knowledge of union activity may be inferred when an employee's statutorily protected statements and conduct take place within a small facility. *See, e. g., Wiese Plow Welding Co.,* 123 N.L.R.B. No. 616, 43 L.R.R.M. 1495 (Apr. 6, 1959). This doctrine rests on the view that an employer at a small facility is likely to notice union

activities at the plant because of the closer working environment between management and labor. In this circuit, however, the small plant doctrine will not in itself support an inference of an employer's knowledge of union activities. The smallness of the plant may be material but only if other evidence exists indicating a likelihood of such knowledge.

> [T]he mere fact that Respondent's plant is of a small size, does not permit a finding that Respondent had knowledge of the union activities of specific employees, absent supporting evidence that the union activities were carried on in such a manner, or at times that in the normal course of events, Respondent must have noticed them. [*Amyx Industries, Inc. v. NLRB,* 457 F.2d 904, 907 (8th Cir. 1972), *quoting Hadley Mfg. Co.,* 108 N.L.R.B. 1641, 1650 (1954).]

*See Webco Bodies, Inc. v. NLRB, supra,* 595 F.2d at 454.

▋ Apart from the small plant doctrine, however, substantial evidence in the record as a whole supports the Board's determination that the Company discharged Bouch for engaging in union activities. Although there exists no direct evidence of the Company's knowledge of Bouch's pro-union activity, the element of knowledge may be proved by circumstantial evidence from which such knowledge may be reasonably inferred. *E. g., Webco Bodies, Inc. v. NLRB, supra,* 595 F.2d at 153; *NLRB v. Wal-Mart Stores, Inc.,* 488 F.2d 114, 116 (8th Cir. 1973). "The fundamental test is whether there is a rational connection between the facts proved and the fact that is to be inferred." *NLRB v. Wal-Mart Stores, Inc., supra,* 488 F.2d at 117.

Here, the Board could reasonably infer knowledge of Bouch's union activity from the following evidence: (1) the singling out for discharge the employee who initiated the Union's organizational effort; (2) the timing of that discharge only one week after the Union authorized an organizational drive and almost coincidentally with the

Company's commission of a series of unfair labor practices beginning the day after the Company discharged Bouch; (3) the layoff of a competent employee with a good work record as the "last man hired" when Bouch had been employed nine months longer than a coemployee (Berkey); and (4) the failure to offer Bouch the opportunity of reemployment when the Company, through the hiring of Peterman and Shifflett, brought its work force up to the same number as when Bouch's layoff occurred.

The Company justified its hiring of Peterman and Shifflett as based on a policy not to reassign personnel from a higher-rated job, such as a truckdriver (Bouch), to a lower-rated one, such as a laborer (Peterman or Berkey[4] and Shifflett). The administrative law judge, however, chose to discredit the testimony of the Company president on this matter because of evidence in the record indicating that in the past the work of the employees had not strictly followed job classifications and that the Company previously had transferred dragline operators (the most skilled employees) to other jobs when work was slow for them. The administrative law judge who, as the trier of fact, may choose between conflicting views of the evidence, could properly find the Company's alleged business justification to be pretextual. *See Webco Bodies v. NLRB, supra,* 595 F.2d at 453; *NLRB v. Wal-Mart Stores, Inc., supra,* 488 F.2d at 117.

## 2. *Reinstatement.*

The Company also argues that even if it unlawfully discharged Bouch, he should not be granted reinstatement and backpay because of his postdischarge conduct. Uncontroverted evidence in the record establishes that subsequent to his termination Bouch willfully and unlawfully failed to report earnings to the Pennsylvania Bureau of Employment Security for the purpose of obtaining unemployment compensation benefits to which he was not entitled.[5]

The administrative law judge termed Bouch's misconduct as "reprehensible" and also found Bouch to be an "evasive, shifty * * * [and] untrustworthy" witness during the unfair labor practice charge proceedings. Nevertheless, the administrative law judge recommended that Bouch be reinstated to his job with full backpay on the ground that "but for the [Company's] discriminatory action in laying him off * * * he would not have applied for unemployment compensation, and not have been subject to falsifying the Bureau's forms." The Board adopted that recommendation and directed Bouch's reinstatement with full backpay.

We reject the contention that the Company bears responsibility for Bouch's unlawful conduct. Bouch's dishonesty in misrepresenting his earnings, occurring nearly a month after his discharge, constitutes an independent wrong for which he must assume the consequences.

Section 10(c) of the Act grants the Board broad authority, upon finding that an employer has engaged in an unfair labor practice, "to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this [Act]." 29 U.S.C. § 160(c) (1976). Although courts generally defer to the Board's discretion in ordering reinstatement and backpay, "the rule is not inflexible and situations do exist which justify

---

4. Although the Company hired Peterman as a welder, a position for which Bouch was unqualified, it discharged him one day later for falsifying his employment application. Subsequent to that discharge, the Company reassigned Berkey to its force of laborers rather than offer Bouch the position despite Bouch's seniority over Berkey.

5. Bouch worked for the Cardinal Mining Company for the three weeks ending June 18, June 25, and July 2, during which time he earned $357, $120, and $108, respectively. Because he knowingly failed to report these earnings to the Bureau of Employment Security, Bouch received $141 in benefits for each of those weeks in violation of 43 Pa.Stat.Ann. § 871 (1964 & Supp.1979).

rejection of a reinstatement remedy." *Nebraska Bulk Transport v. NLRB*, 608 F.2d 311, 316 (8th Cir. 1979). *E. g., Nebraska Bulk Transport v. NLRB, supra* (employee-driver's safety record jeopardized employer's insurance policy and ICC operating authority); *NLRB v. Potter Electric Signal Co.*, 600 F.2d 120 (8th Cir. 1979) (employee fights halted production line); *NLRB v. Magnusen*, 523 F.2d 643 (9th Cir. 1975) (employee padded work hours and lied at NLRB hearing); *NLRB v. R. C. Can Co.*, 340 F.2d 433 (5th Cir. 1965) (employee threatened company president with bodily harm). *Cf. Berbiglia, Inc. v. NLRB*, 602 F.2d 839 (8th Cir. 1979) (evidence of disparate treatment of union and antiunion employees overcomes nominal justification for discharge).

Among those grounds which courts have regarded as justification for denying reinstatement have been employee dishonesty, *e. g., NLRB v. Magnusen, supra; Iowa Beef Processors, Inc. v. NLRB*, 567 F.2d 791 (8th Cir. 1976); *NLRB v. Commonwealth Foods, Inc.*, 506 F.2d 1065 (4th Cir. 1974); *NLRB v. Breitling*, 378 F.2d 663 (10th Cir. 1967); *NLRB v. Big Three Welding Equipment Co.*, 359 F.2d 77 (5th Cir. 1966), and false testimony at the NLRB proceeding convened to process the employee's unfair labor practice charge, *e. g., NLRB v. Magnusen, supra; NLRB v. Coca-Cola Bottling Co.*, 333 F.2d 181 (7th Cir. 1964); *Iowa Beef Packers, Inc. v. NLRB*, 331 F.2d 176 (8th Cir. 1964).

■ Bouch's dishonesty, although not directed at the Company, nevertheless adversely affected his employer because the Company's unemployment reserve account was initially charged $250 for benefits wrongfully paid to Bouch. In our view, the purposes and policies of the Act do not justify full reinstatement of an employee whose dishonesty has been established and whose untruthful testimony abused the process he now claims should grant him full relief. Thus, Bouch should be granted reinstatement with full backpay for only that period preceding his unlawful postdischarge conduct.

## C. Bargaining Order.

As its last exception to the Board's findings, the Company contends that the Board improperly issued a bargaining order in this case because the Union lacked majority status on July 8, the date that the Union requested recognition as the certified bargaining agent for the Company's employees. The Board responds that the operative date of a bargaining order need not necessarily be the same date on which a union requests recognition, and that substantial evidence on the record as a whole supports its finding that the Union achieved majority status on May 2. We agree with the Board.

■ When an employer's misconduct so dissipates a union's majority support that it destroys or seriously impairs the possibility of conducting a fair election, the Board may issue a bargaining order and forego a representation election. The operative date of the bargaining order is the date on which the union obtains majority status in an appropriate unit after the employer has embarked on a course of unfair labor practices tending to undermine that majority and impede the election process. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969); *NLRB v. Dixiesteel Buildings, Inc.*, 445 F.2d 1260, 1265 (8th Cir. 1971). Here, the Union obtained majority status among the employees on May 2 when thirteen of twenty-four members in the bargaining unit had signed valid authorization cards. Both before and after that date, the Company committed serious unfair labor practices. *See* note 1 *supra*. Thus, the Board could properly issue a bargaining order.

■ The Company argues, however, that the Board erred in excluding Yoder and Shifflett from the bargaining unit; inclusion of these employees would leave the Union without majority support on May 2.

Having examined the record, we conclude that the Board did not abuse its discretion in excluding Shifflett and Yoder from the bargaining unit. Shifflett first began work June 27, after the Union obtained majority status on May 2. To obtain a bargaining order, a union need not maintain a continuing majority in the face of continuing unfair labor practices; otherwise, the employer could benefit from its own misconduct. *NLRB v. Arrow Specialities, Inc.*, 437 F.2d 522, 525–26 (8th Cir. 1971). Yoder, as lessor of one of the tracts that the Company mined, engaged in a relationship with the Company totally unlike the employer-employee relationship of any other employee of the Company. As characterized by the administrative law judge:

> Yoder's pecuniary interests are directly tied in to Respondent's ability to mine coal, so that if coal is not mined, as during a strike, neither he or his wife would receive any royalties. Yoder and his wife would also be required to pay real estate taxes during such a strike, despite the fact that they were receiving no royalties. Thus, in the event of a strike called by the Union, Yoder would have loyalties to his wife as co-lessor, and to the Respondent as lessee, that would be contradictory to the purpose of the striking employees, that no coal be mined.

As a result, the Board could justifiably find that Yoder's lease with the Company so aligned his interest with management as to extinguish his community of interest with the other employees. *See NLRB v. Hoerner-Waldorf Corp.*, 525 F.2d 805 (8th Cir. 1975).

Accordingly, substantial evidence in the record sustains the Board's view that the Union achieved majority status on May 2 and justifies the Board's issuance of a bargaining order as of that date. The Company's refusal to bargain with the Union despite that order constitutes a violation of section 8(a)(5). *See* 29 U.S.C. § 158(a)(5) (1976).

III. *Conclusion.*

For these reasons, we enforce the Board's order in all respects except as to the rein-

statement remedy applicable to employee Bouch.