**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MONTGOMERY WARD & COMPANY,
INCORPORATED,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent,                                                           No. 95-2654

and

WAREHOUSE UNION, LOCAL 730, A/W
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, AFL-CIO,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.
                                                                      No. 95-2669

MONTGOMERY WARD & COMPANY,
INCORPORATED,
Respondent.

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board.
(5-CA-22686)

Argued: June 7, 1996

Decided: September 20, 1996

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
CURRIE, United States District Judge for the District of South
Carolina, sitting by designation.

Order enforced by unpublished per curiam.

_____

**COUNSEL**

**ARGUED:** Marshall Bruce Babson, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Washington, D.C., for Montgomery Ward. Christopher Warren Young, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB. Elizabeth Jane Head, BEINS, AXELROD, OSBORNE, MOONEY & GREEN, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Erin E. Powell, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, Washington, D.C., for Montgomery Ward. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB. John R. Mooney, BEINS, AXELROD, OSBORNE, MOONEY & GREEN, P.C., Washington, D.C., for Intervenor.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Montgomery Ward & Company, Inc., has petitioned for review of a decision and order issued against it by the National Labor Relations Board ("Board") on April 19, 1995. Reversing the administrative law judge ("ALJ") who originally heard the case, the Board found that Montgomery Ward violated sections 8(a)(1) and (a)(3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (3). Montgomery Ward has contended that the Board's finding of unlawful termination is not supported by substantial evidence in the record as a whole and that its finding of unlawful statements is improper because

2

it is not consistent with the allegations contained in the complaint. The Board has cross-petitioned for enforcement of the order. We hereby enforce the order.

I.

Montgomery Ward operates warehouse storage and distribution facilities nationwide to supply merchandise to its retail stores. In January 1992, Montgomery Ward consolidated its mid-Atlantic distribution operation by closing two distribution centers and opening a new facility in Brandywine, Maryland. In April 1992, Warehouse Employees Local Union No. 730, (the "Union"), which had conducted an unsuccessful organizational campaign at the Brandywine facility, filed a charge against Montgomery Ward before the Board. Subsequently, the Board's General Counsel issued a complaint, alleging that the company (1) violated sections 8(a)(1) and (3) by discharging two employees solely because of their union activity; and (2) violated section 8(a)(1) by making statements that implied that it would be futile for employees to choose union representation. [1] An ALJ held a two-day hearing in which Montgomery Ward denied making unlawful statements and having knowledge of the discharged employees' union involvement. The company maintained that it fired the two employees because of their poor job performance.

During the relevant time period, approximately 235 employees worked at the Brandywine center, filling between 1,500 and 3,000 orders for shipment to retail stores each day. About 16 employees worked as "order fillers." In that capacity, they used "picking tickets" to identify, locate and collect merchandise for shipment. They affixed the tickets to the designated merchandise and then sent it out to the loading docks. At the docks, other employees worked as "loaders,"

_____

[1] Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights to self-organization and to form, join or assist labor organizations as guaranteed in Section 7 of the Act. 29 U.S.C.§ 158(a)(1).

Section 8(a)(3) prohibits discrimination "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

placing the designated items on to trucks after scanning their bar codes for inventory purposes.

Montgomery Ward hired both Dennis Guss and Paul Groenwoldt in February 1992. Guss worked as an order filler, while Groenwoldt worked as a loader. In early January 1992, before the Brandywine facility was fully operational, the Union began an organizational campaign with leafletting in the parking lot and the distribution of authorization cards to employees.

Regarding the company's anti-union statements, the record indicates that at the end of February, Montgomery Ward officials held a meeting with all Brandywine employees.**2** At the meeting, company Vice-President Thomas Cato apparently spoke about"third-party representation." There was testimony before the ALJ that Cato told employees that he anticipated a fruitful working relationship without such interference and that "we don't need no third-party or organization come in here over my dead body."

Company officials met again with Brandywine employees in mid-March to address the benefits and drawbacks of union representation. In a series of smaller meetings, Cato apparently compared the employee benefits at Brandywine to those at the company's unionized Baltimore facility in an effort to show that the union could not guarantee higher wages and discussed the Union's organizing drive. There was testimony before the ALJ that Guss requested additional information about "union benefits," but Cato could not provide any. There was also testimony that Cato told employees at one of the gatherings that "if he had anything to do with keeping the union out, he would," and that "there would be blood on the floor before the Union came in." The record further shows that the company issued a memorandum to Brandywine employees on March 20, explaining that the Union was attempting to organize and urging employees not to sign union authorization cards.

_____

**2** Among those officials present at the meeting were: Thomas Cato, the vice president of Logistics and Product Services; James Schmitt, the manager of the Brandywine facility and East Coast distribution centers; and Michael Cardamone, the operations manager at the Brandywine facility.

As to Guss and Groenwoldt's union activity, there was testimony that, at Guss's suggestion, the two men and one other Montgomery Ward employee attended the Union's first and only organizational meeting on April 13. While there, they signed authorization cards and agreed to distribute cards to other employees. They apparently asked the Union not to notify Montgomery Ward that they were on its organizing committee because they did not want the company to know of their activities.

Testimony showed that during the next three days, Guss and Groenwoldt solicited union support from other Brandywine employees. Guss discussed the Union with 18 to 20 employees in the cafeteria at lunchtime and in the parking lot after work and distributed a handful of authorization cards. Groenwoldt apparently talked to six or seven employees about the Union and asked them to sign authorization cards, but passed out no cards. There was testimony that the two men came to believe that management was watching them more closely than usual, and so informed the Union that they wanted to "chill a little while." Company management testified that they knew nothing about the union involvement of Guss and Groenwoldt.

The evidence relating to the discharges of Guss and Groenwoldt showed that the facility's operations manager, Michael Cardamone, fired both employees within minutes of each other on April 17 -- only three days after the organizational meeting. There was conflicting testimony regarding the job performance of each man.

Guss testified that he received no criticism before April 16. Although he apparently misplaced a picking ticket three weeks earlier, supervisors never disciplined him or complained. Instead, Guss said he was regularly summoned to work overtime and once asked to monitor another employee. His "group leader" testified, however, that she had spoken with Guss and complained to her superiors about his attitude, failure to stack merchandise properly, propensity to lose picking tickets and low productivity. Supervisors discussed these criticisms with Guss on April 16. The following morning, Guss again misplaced two picking tickets and was fired without warning at the end of his shift. Guss testified that his immediate boss, Todd Lennox, admitted to him that the firing was "bullshit" ordered by upper management.

5

Similarly, there was evidence that Groenwoldt received his first reprimand for failing to follow proper procedure when scanning merchandise on April 15. At that time, supervisors merely reminded him of the proper method. While Groenwoldt admitted that he did not always use the proper method, testimony indicated that he was not the only employee to do so. Another employee seen improperly scanning during the same week received a warning about what consequences he would suffer for repeating the mistake. Like Guss, Groenwoldt was fired without warning at the end of his shift. His discharge notice indicated that he had been observed improperly scanning on April 15 and 17.

The ALJ ruled that the General Counsel had failed to establish a prima facie case of unlawful discrimination in the termination of Guss and Groenwoldt. Although he found that Guss and Groenwoldt engaged in union activity and that Montgomery Ward demonstrated strong anti-union animus and discriminated against Guss and Groenwoldt shortly after their union activity, the ALJ recommended dismissing the unlawful discharge allegations nonetheless because he found no evidence that Montgomery Ward knew of the two employees' union activity. The ALJ also found that although Cato made unlawful anti-union statements, those statements were not encompassed in the allegations of the complaint. Thus, the ALJ recommended dismissing all charges against Montgomery Ward.

A panel of the Board overturned the ALJ. The panel inferred employer knowledge of the participation of Guss and Groenwoldt in the union campaign and determined that the company violated sections 8(a)(3) and (a)(1) by discharging the two men for engaging in protected activities. The Board also concluded that Montgomery Ward violated section 8(a)(1) with two statements Cato made to employees implying that it would be futile for them to select union representation. The Board ordered Montgomery Ward to cease and desist from the unfair labor practices found and to reinstate and make whole the discharged employees.

II.

Montgomery Ward has challenged the Board's conclusion that the discharges constituted violations of sections 8(a)(1) and (3) of the Act

6

as well as its determination that two employer statements violated section 8(a)(1) by implying the futility of selecting union representation.

In general, our standard of review is one of deference. We may not disturb the Board's findings and conclusions if they are supported by substantial evidence taken from the record as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB , 340 U.S. 474, 487-91 (1951); FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995). We "may not displace the Board's choice between two fairly conflicting views even though [we] would justifiably have made a different choice had the matter been before [us] de novo," Universal Camera Corp., 340 U.S. at 488; accord NLRB v. Frigid Storage, Inc., 934 F.2d 506, 509 (4th Cir. 1991).

We note that the Board is not precluded from drawing inferences or legal conclusions that are contrary to those of the ALJ. See American Thread Co. v. NLRB, 631 F.2d 316, 320 (4th Cir. 1980). The substantial evidence standard of review is applicable to the Board's inferences from facts because "[t]he Board, not the ALJ, is ultimately vested with the responsibility for determining whether an unfair labor practice has been committed." Id.; see also Frigid Storage, 934 F.2d at 509.

A

Termination in retaliation for union activity, including attempts to organize a union, violates both sections 8(a)(1) and (a)(3) of the Act. NLRB v. Transportation Management Corp., 462 U.S. 393, 397-98 (1983); FPC Holdings, 64 F.3d at 941; NLRB v. Nueva Eng'g Inc., 761 F.2d 961, 969 (4th Cir. 1985). The Board applies a basic, burden-shifting formula for determining when a discharge is unlawful.[3] See Transportation Management Corp., 462 U.S. at 400-04 (affirming the Board's "Wright Line test"). Under that approach, the General Counsel must first establish a prima facie case, showing by a preponderance of the evidence that anti-union animus motivated the employer's

_____

[3] The Board's formula was first articulated in Wright Line, 251 NLRB 1083 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982).

7

decision to terminate an employee. The burden then shifts to the employer to prove affirmatively that it would have taken the same action even in the absence of union involvement by the employee. FPC Holdings, 64 F.3d at 942 (citations omitted); accord Transportation Management Corp., 462 U.S. at 401-02. If the Board determines, however, that the employer's asserted reasons are pretextual -- i.e., that they did not exist or were not relied upon -- then the employer has failed to meet its burden. See Nueva Eng'g, 761 F.2d at 968-69. A violation occurs only when "there is a basis in the record for a finding that the employee would not have been discharged . . . except for the fact of his union activity." NLRB v. Kiawah Island Co., 650 F.2d 485, 490 (4th Cir. 1981) (citation omitted); see also Goldtex, Inc. v. NLRB, 14 F.3d 1008, 1011 (4th Cir. 1994) ("Unwise and even unfair decisions to discharge employees do not constitute unfair labor practices unless they are carried out with the intent of discouraging participation in union activities.").

We affirm the Board's findings and conclusions regarding the discharges of Guss and Groenwoldt. Substantial evidence supports the determination that Montgomery Ward would not have discharged the two employees were it not for their participation in protected activity.

Montgomery Ward's attempts to challenge the Board's decision are without merit. First, the company contends that the ALJ properly concluded that the General Counsel failed to establish a prima facie case of unlawful discharge for either Guss or Groenwoldt because it was unable to show that the company knew of their union activities. Second, Montgomery Ward maintains that it provided substantial evidence that, in any event, it would have fired each employee for poor performance.

To prove a prima facie case, "the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, (3) that the activity was a substantial or motivating reason for the employer's action." FPC Holdings, 64 F.3d at 942. When there is no direct proof, employer knowledge may be shown by circumstantial evidence from which a reasonable inference may be drawn. Id. at 943-44; Davis Supermarkets, Inc v. NLRB, 2 F.3d 1162, 1168 (D.C. Cir. 1993), cert. denied, 114 S. Ct. 1368 (1994); NLRB v. Wal-Mart Stores , 488 F.2d 114, 117

8

(8th Cir. 1973); see generally NLRB v. Link-Belt Co., 311 U.S. 584, 602 (1941). Such circumstances may include knowledge of general union activity, demonstrated anti-union animus, suspicious timing and nature of the discharge and disparate treatment of employees. See Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 813-15 (3rd Cir. 1986), cert. denied, 481 U.S. 1069 (1987); see also Abbey's Transp. Servs. v. NLRB, 837 F.2d 575, 580 (2d Cir. 1988); Wal-Mart Stores, 488 F.2d at 117.

Montgomery Ward concedes that it had general knowledge of the Union's organizing efforts at the Brandywine facility. Substantial evidence supports the Board's inference that the company had specific knowledge of Guss's and Groenwoldt's participation in those efforts. Based on the openness of their campaigning at the facility, their positions as the only Brandywine employees to show significant interest in unionization, the closeness of their firings to their union activity, the abrupt nature of their discharges and the strong anti-union animus displayed at the company's highest corporate levels, the Board's inference that the company knew about the union activity of Guss and Groenwoldt is reasonable. The Board relied only on evidence adduced before the ALJ and did not overturn any of his credibility determinations in concluding that a "confluence of circumstances" showed that Montgomery Ward was aware of the employees' participation in the unionization effort. Although there is some evidence to the contrary, the evidence offered to show that Montgomery Ward management did not know of the two employees' activities does not outweigh the circumstantial proof allowing the Board to infer that it did.

Similarly, we find that substantial evidence supports the Board's finding that Montgomery Ward's proffered reasons for discharging Guss and Groenwoldt were pretextual. Testimony before the ALJ indicated that no one questioned Guss's work and production levels until he began soliciting employees for the Union. He lost a picking ticket three weeks before his termination, yet no supervisor reprimanded him. At the time of his discharge, his immediate boss conceded that the firing was "bullshit" ordered by higher company officials. Finally, supervisors offered conflicting descriptions of company policy regarding lost picking tickets and provided no evidence of prior discipline for the error.

9

Similarly, Groenwoldt was not disciplined or even reprimanded for poor performance prior to his participation in the union campaign. Although he admitted improperly scanning merchandise, he received no warning before his termination, although other employees who also used improper methods did. Finally, substantial evidence supports the Board's conclusion that the events surrounding Groenwoldt's discharge were indicative of a set up. Testimony showed that when Groenwoldt arrived at work on April 17, he was told to report to Cardamone's office at the end of his shift, and when he did so, he was fired for improperly scanning merchandise on April 15 and earlier that same day.

In short, evidence before the ALJ showed that both men were praised for their work before they participated in the union campaign, and disciplined afterward. Neither received notice of poor performance or a warning that termination was possible. Again, there is some evidence of substandard performance on the part of each employee. Yet that evidence fails to override the substantial support for the Board's conclusion that Montgomery Ward would not have fired either Guss or Groenwoldt if they had not engaged in union activity. Accordingly, we must enforce that part of the order relating to the unlawful discharges.

B

An employer's warnings to employees that unionization will be futile or fruitless can amount to a violation of section 8(a)(1) as an interference with an employee's right to self-organization. See, e.g., Standard-Coosa-Thatcher Carpet Yarn v. NLRB, 691 F.2d 1133, 1136 (4th Cir. 1982) (finding that comment made on union election day that company's contract covering unionized employees was not beneficial was unlawfully coercive), cert. denied , 460 U.S. 1083 (1983); NLRB v. McCormick Concrete Co., 371 F.2d 149, 152 (4th Cir. 1967) (holding that statement that "a union would do employees no good" can be unlawfully coercive). Substantial evidence supports the Board's finding that Vice President Cato made two statements -- those concerning unionization "over my dead body" and only after "blood on the floor" -- which violated section 8(a)(1). However, instead of contesting the Board's finding, Montgomery Ward claims that the two statements were outside the allegations of the complaint.

The ALJ so found, but we agree with the Board's contrary conclusion.

The complaint satisfies NLRB regulations requiring a clear and concise description of the acts which are claimed to constitute unfair labor practices. See 29 CFR § 102.15(b). Furthermore, the Board's determination that Montgomery Ward engaged in unfair labor practices does not rest on facts outside or unrelated to the allegations in the complaint. See NLRB v. Threads, Inc., 308 F.2d 1, 9 (4th Cir. 1962) ("Evidence without supporting allegations cannot serve as the basis of a determination of an unfair labor practice."); see also Clearwater Finishing Co. v. NLRB, 670 F.2d 464, 468 (4th Cir. 1982) (applying Threads, and finding that Board improperly allowed non-alleged facts to serve as evidence of a violation).

General Counsel alleges in the complaint that Montgomery Ward violated section 8(a)(1) with statements Cato made to employees on March 9, 1992. Without quoting any particular comment, the complaint states that Cato told employees that: (1) Montgomery Ward "would learn the identity of those who signed union authorization cards;" (2) "strikes and violence would inevitably result from selecting a union as their representative;" and (3)"it would be futile for them to select a union as their bargaining representative." While there may be some discrepancy over the exact date Cato made each statement, the fact remains that the allegations of the complaint do encompass the two statements at issue. Furthermore, consideration of those statements cannot be said to have deprived Montgomery Ward of due process as the complaint provided sufficient notice of the acts alleged to constitute unfair labor practices and the company received a full and fair opportunity to litigate the matter. See Pergament United Sales, Inc. v. NLRB, 920 F.2d 130, 134 (2d Cir. 1990) (due process requires notice and meaningful opportunity to defend); see also NLRB v. MacKay Radio & Tel. Co., 304 U.S. 333, 349-51 (1938). The statements certainly did not call for a different defense than the one mounted by the company. See FPC Holdings, 64 F.3d at 942.

Finally, both the ALJ and the Board found that the two statements demonstrate anti-union animus, and we agree. Considering not only the substance of the statements but the context in which they were made, they are coercive and would have a tendency to intimidate

11

employees from engaging in union activity. See NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969) (assessment of an employer's statements "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear"); J.P. Stephens & Co. v. NLRB, 638 F.2d 676, 687 (4th Cir. 1980) ("an employer's speech must be viewed in the context of its labor relations setting").

We see no reason, therefore, to disturb the Board's conclusion that Montgomery Ward violated section 8(a)(1) with Cato's statements.

III.

In sum, we find that substantial evidence supports the Board's findings of fact and conclusions of law. Accordingly, Montgomery Ward's petition for review is hereby denied and the order is

ENFORCED.