681 F.2d 11
 110 L.R.R.M. (BNA) 2845, 220 U.S.App.D.C. 283,
94 Lab.Cas. P 13,631
 ROAD SPRINKLER FITTERS LOCAL UNION NO. 669, etc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
John Cuneo, Inc., Intervenor.
JOHN CUNEO, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Road Sprinkler Fitters Local Union No. 669, U.A., Intervenor.
 Nos. 81-1025, 81-1705.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 2, 1982.
Decided June 18, 1982.
 
 Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Ronald G. Ingham, Chattanooga, Tenn., for John Cuneo, Inc., petitioner in No. 81-1705 and intervenor in No. 81-1025.
 William W. Osborne, Jr., Washington, D. C., for Local No. 669, petitioner in No. 81-1025 and intervenor in No. 81-1705. Angelo V. Arcadipane, Woody N. Peterson and Joan M. Darby, Washington, D. C., were on the brief for Local No. 669.
 Susan L. Dolin, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.
 Before WALD, MIKVA and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 EDWARDS, Circuit Judge:
 
 
 1
 These consolidated petitions for review present a question of apparent first impression in the Courts of Appeals. The case arose out of complaints of employer unfair labor practices during a union organizational campaign in late 1977. Relying on its decision in Drug Package Co., 228 N.L.R.B. 108 (1977), enforced in part, 570 F.2d 1340 (8th Cir. 1978), the National Labor Relations Board ("NLRB" or "Board" ) ruled that where a majority of employees have participated in a strike for union recognition and where the employer has engaged in contemporaneous and widespread illegal conduct that justifies the imposition of a retroactive bargaining order, the striking employees are entitled to reinstatement as unfair labor practice strikers as of the time when they made unconditional offers to return to work. For the reasons set forth below, we deny the petitions for review and grant enforcement of the Board's order.
 
 I. BACKGROUND
 
 2
 A. The Union Organizational Campaign and the Ensuing Strike[1]
 
 
 3
 John Cuneo, Inc. (the "Company" ) is a Tennessee corporation with an office and place of business in Chattanooga, where it designs, manufactures and sells fire protection sprinkler systems. On September 15, 1977, Road Sprinkler Fitters Local Union No. 669 (the "Union" ) held an organizational meeting at the Chattanooga Ramada Inn. Union representatives met with eight of the Company's fourteen fabrication shop employees and distributed union authorization cards, which the eight employees read, signed and returned to the representatives. Later that day, three night-shift employees who had not attended the Ramada Inn meeting also signed union authorization cards.
 
 
 4
 The next day, union representatives met with Company President Bob Splawn. They informed him that a majority of the shop employees had selected the Union to represent them for the purposes of collective bargaining. Splawn refused to recognize and bargain with the Union and told the representatives to go to the National Labor Relations Board. Meanwhile, another union representative traveled to Atlanta, Georgia to file a representation petition with the Board's Regional Office.
 
 
 5
 Immediately after refusing the Union's demand for recognition, Splawn contacted the Company's labor counsel. Splawn then called Gerald Hall, the senior shop employee, into his office and questioned him about the organizational drive and Hall's own views of the union activity. Hall declined to discuss the matter. Later that day, President Splawn again summoned Hall into his office, where Splawn and the Company's labor counsel interrogated Hall concerning his knowledge of the Union. The Company attorney also asked Hall a series of questions designed to establish his possible status as a supervisor and asked Hall to sign a statement saying that he was a supervisor. Hall refused to comment on the union or to sign the statement.
 
 
 6
 Following the second meeting with Hall, Splawn summoned Supervisor Ray Collins and asked him who had signed the authorization cards. When Collins replied that he did not know, Splawn directed him to find out. Shortly thereafter, Collins told Ted Hall, one of the shop employees, that Splawn had ordered him to find out what he could about the Union, including which employees had signed authorization cards.
 
 
 7
 On Tuesday, September 20, Gerald Hall was called into Splawn's office for a third meeting. President Splawn again attempted to persuade Hall to sign a statement saying that he was a supervisor. When Hall refused, Splawn threatened to discharge him. Hall responded that he would "just have to be fired" and left. After a Company supervisor followed Hall and confided that Splawn did not really wish to fire him, the meeting resumed. Hall eventually agreed to sign the statement after Splawn told Hall that the Company's employees would not benefit from union representation.[2]
 
 
 8
 Meanwhile, on September 20, the shop employees met and agreed that if the Company refused to recognize the Union on the following day, they would strike. The next day, union representatives again demanded that Splawn recognize and bargain with the Union. Shortly after Splawn refused, eight of the ten bargaining unit employees working on the day shift walked out and began picketing the Company. Within an hour, President Splawn came to the picket line, counted the striking employees and announced that if they did not return to their jobs in fifteen minutes they would be permanently replaced. The employees ignored Splawn's declaration and continued to picket. Later that evening the strikers were joined by three of the night-shift employees and by Gerald Hall and Supervisor Collins.
 
 
 9
 On September 22, Splawn hired a Pinkerton guard to observe the picket line. The guard and the Company's labor counsel each photographed the employees who were engaged in peaceful picketing on September 23. Subsequently, on October 14, another Company representative photographed a lone picketer at a secondary location.
 
 
 10
 Also on September 22, Splawn interviewed and hired two striker replacements. As the replacements were leaving the plant, striker Michael Green approached their car and threatened them. The replacements drove away, but Green and another person followed them in another car for about four miles. Green repeatedly drove past the replacements' car and then slowed to a halt in front of them in unsuccessful attempts to stop the replacements. When the replacements arrived at their destination, they called President Splawn and told him what had occurred.
 
 
 11
 On October 6, while the strike was still in progress, Green contacted Supervisor Izell about returning to work. Izell told Green that no positions were then available, but that he would be contacted when one opened up. On October 20, the Company sent Green a telegram advising him that a position was available and that he could return to work subject to discipline for any picket line misconduct. When Green arrived for work on October 24, two of the striker replacements identified him as one of the individuals who had threatened and followed them on September 22. Green also left work early on October 24 without notifying anyone. The next day Izell confronted Green with the information about the replacements' identification of him and with a query about his early departure from work on October 24. Following their meeting, Izell suspended Green pending investigation of his picket line activity and his asserted reason for leaving work. Green was later discharged when his explanation for leaving work early was not substantiated. Izell stated that Green's termination was due to his picket line misconduct, his early departure from work and his falsification of a reason for his departure.
 
 
 12
 The strike continued until November 14, when the Union forwarded to the Company seven strikers' unconditional offers to return to work.[3] None of the seven employees was immediately reinstated, however. Despite vacancies, the first two striking employees were not reinstated until February 1, 1978. One more striker was reinstated on February 20, 1978, and another on June 23, 1978. At the time of the hearing before the A.L.J., in September and November 1978, two of the employees still had not been offered reinstatement.
 
 
 13
 When the first two striking employees finally returned in February 1978, President Splawn told them that they should not talk about the Union on the job. In addition, these two employees were warned, pursuant to a newly adopted tardiness rule, that they would be discharged if they were late for work three times. After they were late twice, a Company Foreman told them that they had one more chance. The evidence in the case indicated that only the reinstated strikers were made subject to the new tardiness rule.
 
 B. The Proceedings Below
 
 14
 Based on the Union's unfair labor practice charges, the General Counsel of the NLRB issued complaints against John Cuneo, Inc., alleging that the Company had violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the Labor Management Relations Act (the "Act" ), 29 U.S.C. § 158(a)(1), (3), (5) (1976), in its response to the union organizational campaign.
 
 
 15
 After several days of hearings, the A.L.J. found that the Company had violated section 8(a)(1) of the Act by interrogating employee Gerald Hall on three occasions, by threatening Gerald Hall with discharge if he failed to sign a statement saying that he was a supervisor, by creating the impression of surveillance of the employees' union activities through Supervisor Collins' conversation with Ted Hall, by engaging in surveillance through its photographing of employees participating in peaceful picketing, and by promulgating a rule prohibiting employees from engaging in union discussion at any time on Company premises. The A.L.J. also found that the Company had violated sections 8(a)(3) and 8(a)(1) by failing to reinstate economic strikers in a timely manner and by instituting and enforcing a new system of progressive discipline for tardiness in order to discourage Union membership. The A.L.J. further found that the Company had violated sections 8(a)(5) and 8(a)(1) by refusing, since September 16, 1977, to recognize and bargain collectively with the Union. On this point, the A.L.J. concluded that, because the employees were aware of the unfair labor practices that had occurred before September 21, the strike was an unfair labor practice strike from its inception. Finally, the A.L.J. dismissed the portions of the complaint alleging that employee Green had been discriminatorily discharged in violation of sections 8(a)(3) and 8(a) (1) and that employee Gregg had been interrogated about Union activity in violation of section 8(a)(1).
 
 
 16
 The Board adopted each of the Administrative Law Judge's findings of violations of sections 8(a)(1), 8(a)(3) and 8(a)(5) of the Act, and affirmed the dismissal of the section 8(a)(1) and 8(a)(3) allegations relating to Green and Gregg. The Board, however, rejected the A.L.J.'s characterization of the strike as an unfair labor practice strike from its inception. Instead, the Board relied on its ruling in Drug Package Co., 228 N.L.R.B. 108 (1977), and found that, although the strike commenced as one for recognition, it was converted to an unfair labor practice strike when the Company engaged in widespread unfair labor practices of sufficient seriousness to justify the imposition of a remedial bargaining order.
 
 
 17
 The Board ordered the Company to cease and desist from committing the unfair labor practices and from in any like or related manner interfering with, restraining or coercing its employees in the exercise of their rights under the Act. In agreement with the A.L.J.'s recommendation, the Board ordered the Company to recognize and, upon request, to bargain with the Union. The Board also ordered the Company to offer the six striking employees immediate and full reinstatement, discharging if necessary any persons hired to replace them, and to make these striking employees whole for any loss of earnings dating back to November 14, 1977, plus interest. Finally, the Board ordered the Company to rescind its newly adopted rule prohibiting employees from discussing the Union on Company premises at any time and its discipline system relating to employee tardiness.
 
 
 18
 In No. 81-1025 the Union petitions this court for review of the Board's dismissal of the portions of the complaint alleging that employee Green had been unlawfully discharged and employee Gregg unlawfully interrogated. In No. 81-1705 the Company petitions for review of those portions of the Board Decision and Order that found that the Company had violated sections 8(a)(1), 8(a)(3) and 8(a)(5) and that ordered the Company to bargain with the Union.[4] On July 14, 1981, this court ordered sua sponte that No. 81-1025 and No. 81-1705 be consolidated for review on the merits. The Board has cross-applied for full enforcement of its Order.[5]
 
 II. ANALYSIS OF THE UNFAIR LABOR PRACTICES
 
 19
 We have little difficulty disposing of the challenges to the various unfair labor practices found by the Board. As noted earlier, see note 1 supra, our review of the record reveals that the Board's factual findings are supported by substantial evidence on the record as a whole and are therefore conclusive. 29 U.S.C. § 160(e), (f) (1976). Moreover, the Board's legal conclusions based on its factual findings are consistent with settled precedent. Accordingly, for the reasons set forth below, we affirm the Board's conclusions with respect to each of the unfair labor practice charges.[6]
 
 
 20
 A. Interrogations and Threatened Discharge of Employee Gerald Hall
 
 
 21
 The Company does not dispute that coercive interrogation of employees concerning union activities, under circumstances like those involved in the three interrogations of Gerald Hall, violates section 8(a)(1) of the Act. E.g., Midwest Regional Joint Board, Amalgamated Clothing Workers v. NLRB, 564 F.2d 434, 443 (D.C.Cir.1977); Teamsters Local 633 v. NLRB, 509 F.2d 490, 493-95 (D.C.Cir.1974). Nor does the Company contest that the threatened discharge of an employee for union activities is an unfair labor practice prohibited by section 8(a)(1). E.g., NLRB v. Maywood Plant of Grede Plastics, 628 F.2d 1, 3 (D.C.Cir.1980) (per curiam). The Company contends, however, that the Board erred in finding that the interrogations and threatened discharge of Hall violated section 8(a)(1) because Hall is a supervisor and is therefore unprotected by the provisions of section 8(a)(1).
 
 
 22
 The Board adopted the A.L.J.'s finding that Hall was an employee, and not a supervisor, within the meaning of the Act. John Cuneo, Inc., 253 N.L.R.B. 1025, 1027, 1031-32 (1981); see 29 U.S.C. § 152(3), (11) (1976). The factual judgment of supervisory status, of course, "lies ... squarely within the Board's ambit of expertise." Oil, Chemical & Atomic Workers v. NLRB, 445 F.2d 237, 241 (D.C.Cir.1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972). In the present case, we find the Board's judgment supported by substantial record evidence and fully consistent with applicable precedent. See, e.g., Oil, Chemical & Atomic Workers v. NLRB, 445 F.2d at 240-44; Amalgamated Clothing Workers v. NLRB, 420 F.2d 1296, 1300 (D.C.Cir.1969) (per curiam). We therefore decline to set aside the Board's determination that Gerald Hall was an employee within the meaning of the Act, see NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130-31, 64 S.Ct. 851, 860-61, 88 L.Ed. 1170 (1944), and that the interrogations and threatened discharge were therefore unfair labor practices prohibited by section 8(a)(1).[7]
 
 
 23
 B. Company Surveillance of the Employees' Union Activities
 
 
 24
 The Company does not contest the Board's finding that it created an impression of surveillance of the employees' union activities when Supervisor Collins was directed to find out which employees had signed authorization cards and then interrogated one employee. The Board correctly concluded that creating an impression of surveillance violated section 8(a)(1). E.g., UAW v. NLRB, 455 F.2d 1357, 1367-68 (D.C.Cir.1971).
 
 
 25
 In addition, the Board concluded that the Company violated section 8(a)(1) on three separate occasions by taking pictures of its employees engaged in peaceful picketing. The Board concedes that an employer may validly photograph a picket line to substantiate picket line misconduct or to gather evidence for use in injunctive or unfair labor practice proceedings. See, e.g., NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 700-02 (7th Cir. 1976). The Board and the courts have long recognized, however, that picket line photography has the tendency to interfere with, restrain, or coerce employees engaged in protected concerted activity. See, e.g., Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814, 819 (6th Cir. 1975); UAW v. NLRB, 455 F.2d at 1368; Flambeau Plastics Corp., 167 N.L.R.B. 735, 742-43 (1967), enforced, 401 F.2d 128 (7th Cir. 1968), cert. denied, 393 U.S. 1019, 89 S.Ct. 625, 21 L.Ed.2d 563 (1969). Accordingly, an employer must have "a solid justification" for its photography of employee picketing. NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d at 701. In this case we find no basis for setting aside the Board's finding that the Company lacked such justification for its photography and its conclusion that the Company's activity therefore violated section 8(a) (1).[8]
 
 
 26
 C. Delayed Reinstatement of the Returning Strikers
 
 
 27
 The A.L.J. found that the employees who struck the Company on September 21 "were aware of (the) unfair labor practices prior to the strike." John Cuneo, Inc., 253 N.L.R.B. at 1035. The A.L.J. therefore concluded that the strike which followed resulted both from the employer's refusal to bargain and from the pre-strike unfair labor practices. On this basis, the A.L.J. characterized the strike as an unfair labor practice strike from its inception. The Board rejected this characterization, stating: "Board law holds that an unfair labor practice strike does not result merely because unfair labor practices precede the strike. Rather, there must be a causal connection between the two events which demonstrates that the strike is the direct outcome of the unfair labor practices." John Cuneo, Inc., 253 N.L.R.B. at 1026. The Board found nothing in the record to indicate that the employees were striking for any reason other than to gain recognition of the Union as their bargaining representative.
 
 
 28
 We agree with the Board's characterization of the strikers' initial purpose as recognition. A lawful strike for union recognition is an economic strike, unless unfair labor practices committed by the employer are a "contributing cause" of the strike. Mere awareness of unfair labor practices is insufficient to establish this causal connection. E.g., NLRB v. Pope Maintenance Corp., 573 F.2d 898, 906 (5th Cir. 1978); NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 704 (7th Cir. 1976). The Board fairly read the record here when it concluded that the employees' purpose in striking the Company was only to gain recognition for the Union and not to redress the unfair labor practices that had occurred before September 21, 1977.[9]
 
 
 29
 For our present purposes, the rights of the strikers to reinstatement after their unconditional offer to return to work on November 14 were therefore the rights of economic strikers.[10] As economic strikers, the employees were not entitled to immediate reinstatement if they had been permanently replaced by substitute workers hired during the strike. E.g., NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938). On the other hand, the strikers were entitled to reinstatement to any vacancies existing when they made their unconditional offers to return or to any vacancies resulting from a subsequent departure of permanent replacements or from an expansion of the Company's operations. E.g., NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 380-81, 88 S.Ct. 543, 546-47, 19 L.Ed.2d 614 (1967); Retail, Wholesale & Department Store Union v. NLRB, 466 F.2d 380, 387-88 (D.C.Cir.1972); Laidlaw Corp., 171 N.L.R.B. 1366, 1368-70 (1968), enforced, 414 F.2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). The employer bears the burden of showing that the economic strikers were permanently replaced and that no jobs subsequently became available, or that other legitimate business reasons existed for denying reinstatement. NLRB v. Fleetwood Trailer Co., 389 U.S. at 378, 88 S.Ct. at 545; NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34-35, 87 S.Ct. 1792, 1797-1798, 18 L.Ed.2d 1027 (1967); Laidlaw Corp., 171 N.L.R.B. at 1369.
 
 
 30
 The Board found that the Company failed to carry its burden regarding the reinstatement of the striking employees in this case. By its own admission, the Company's evidence was incomplete and did not even indicate the total number of bargaining unit employees on the payroll on and after November 14. Moreover, the Company's own records indicate that new shop employees were hired on November 25 and on January 17, and that two replacement employees quit on November 30. Despite these four proven vacancies, the evidence reveals that no striking employee was reinstated until February 1.[11] Thus, in addition to the Company's failure to prove that the economic strikers had been permanently replaced and that no vacancies existed on November 14, the unrefuted evidence also indicates that the Company did not promptly offer reinstatement to striking employees as jobs became available after November 14.[12]
 
 D. Institution of a "No-Union-Talk" Rule
 
 31
 When the first two striking employees were finally reinstated in February 1978, President Splawn told them that they should not talk about the Union on the job. It is well settled that "the right of employees to self-organize and bargain collectively ... necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." Beth Israel Hospital v. NLRB, 437 U.S. 483, 491, 98 S.Ct. 2463, 2468, 57 L.Ed.2d 370 (1978). Accordingly, absent a showing of special circumstances by the employer, restrictions on union solicitation during nonworking time are invalid. E.g., id. at 492-93, 98 S.Ct. at 2469-70; Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The restriction in this case was not limited to working time and was otherwise inadequately justified by the Company. President Splawn's only explanation-that he wanted to "keep peace in the work place"-was vague and conclusory, and the rule apparently applied only to pro-union discussions. Given the discriminatory application of the rule and other evidence of the Company's anti-union bias, we have no difficulty upholding the Board conclusion that the no-union-talk rule was adopted for the purpose of discouraging union activity and interfered with employee rights in violation of section 8(a)(1). See United Steelworkers v. NLRB, 393 F.2d 661, 663 (D.C.Cir.1968).
 
 
 32
 E. Promulgation and Discriminatory Application of a Progressive Discipline System
 
 
 33
 In addition to the "no-union-talk" rule, the Company promulgated a new disciplinary system for tardiness when the first two striking employees returned in February 1978. Even though the Company previously had no established policy with respect to employee tardiness, the returning strikers were warned that they would be discharged if they were late for work three times. The Board found, and we have no reason to question, that the Company instituted the progressive discipline system for employee tardiness in order to discourage union membership. The Board thus properly concluded that the implementation of the new work rule violated sections 8(a)(1) and 8(a)(3). E.g., International Union of Electrical, Radio & Machine Workers v. NLRB, 440 F.2d 298 (D.C.Cir.1970) (per curiam). In addition, substantial evidence on the record supports the Board's finding that the new work rule was discriminatorily applied against union supporters in violation of sections 8(a)(1) and 8(a)(3). See, e.g., McGraw-Edison Co. v. NLRB, 533 F.2d 1266 (D.C.Cir.1976).
 
 III. THE APPROPRIATE REMEDY
 
 34
 The Company does not challenge the Board's Order to the extent that it requires traditional cease-and-desist and notice-posting remedies for the Company's unfair labor practices. The Company does, however, contest the bargaining order imposed by the Board. In addition, the Board's characterization of the striking employees as unfair labor practice strikers for remedial purposes presents an issue of apparent first impression in the Courts of Appeals. We now turn our attention to these remaining questions.
 
 A. The Bargaining Order
 
 35
 In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held that the Board may order an employer to bargain with a union even though the union has failed to establish majority support in a Board representation election. The Court enunciated three prerequisites to the issuance of a Gissel bargaining order:[13] (1) the union achieved majority support within an appropriate bargaining unit, id. at 614, 89 S.Ct. at 1940; (2) the employer engaged in unfair labor practices that had "the tendency to undermine majority strength and impede the election process," id.; and (3) "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through (authorization) cards would, on balance, be better protected by a bargaining order," id. at 614-15, 89 S.Ct. at 1940. See also Amalgamated Clothing Workers v. NLRB, 527 F.2d 803, 806-07 (D.C.Cir.1975), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). The Board concluded that these conditions were satisfied in the present case.
 
 1. The Validity of the Authorization Cards
 
 36
 In this case, the Board determined that the Company's fabrication shop employees constitute an appropriate bargaining unit under section 9(b) of the Act. 29 U.S.C. § 159(b) (1976). This unit included fourteen employees in September 1977, eleven of whom signed union authorization cards. The Company challenges the validity of this card majority, however, contending that certain employees were told that the cards would be used to obtain a Board election. The Company argues that the cards therefore cannot be used to establish majority support for the Union.
 
 
 37
 The Company's challenge to the validity of the cards falls short. The cards that the employees signed were unambiguous, single-purpose cards which "authorize (the Union) to represent (the signatory) in collective bargaining negotiations on all matters pertaining to rates of pay, hours or any other condition of employment." Jt.App. 100-07, 118-20. "Where cards are so plain on their face in designating the Union as bargaining agent, their validity can be undercut only if they were solicited by representations that the only purpose was to obtain an election, or there is some other clear evidence of 'gross misstatement' that would undermine the validity of a signed authorization card." Amalgamated Clothing Workers v. NLRB, 420 F.2d 1296, 1301 (D.C.Cir.1969) (per curiam) (footnote omitted); see NLRB v. Gissel Packing Co., 395 U.S. at 601-10, 89 S.Ct. at 1933-38. The evidence presented to the Board in this case did not establish that Union representatives told employees that the sole purpose of the authorization cards was to obtain an election.[14] Nor was there evidence of "gross misstatements" which would negate the cards' plain, unambiguous language. We therefore uphold the Board's conclusion that the authorization cards in this case were reliable indicators of majority support for the Union.[15]
 
 
 38
 2. The Seriousness of the Unfair Labor Practices
 
 
 39
 The Board also concluded that the unfair labor practices committed by the Company "were sufficiently serious and pervasive in character to preclude the holding of a fair election and to warrant the issuance of a bargaining order." John Cuneo, Inc., 253 N.L.R.B. at 1027; see also id. at 1036 (A.L.J. Decision). The Company contests the Board's conclusion.
 
 
 40
 We have no difficulty deciding that the Company's unfair labor practices in this case had the tendency to undermine majority strength and impede the electoral process. Court and Board cases often have viewed unfair labor practices similar to the ones in this case-interrogation, threatened discharge, surveillance, discriminatory application of work rules-as conduct which supports the issuance of a bargaining order. See, e.g., Comment, A Reappraisal of the Bargaining Order: Toward a Consistent Application of NLRB v. Gissel Packing Co., 69 Nw.U.L.Rev. 556, 565-78 (1974); Note, The Gissel Bargaining Order, the NLRB, and the Courts of Appeals: Should the Supreme Court Take a Second Look?, 32 S.C.L.Rev. 399, 411-14 (1980). In addition, the Company's delayed reinstatement of the striking employees was a particularly serious unfair labor practice. As the Board noted, two strikers "were, in essence, discharged since they were never offered their jobs back." John Cuneo, Inc., 253 N.L.R.B. at 1027. Four other strikers were constructively suspended since they "were not offered reemployment until months after (the Company) had begun filling vacancies that occurred following their request to return to work." Id. These constructive discharges and suspensions, especially when coupled with the other unfair labor practices committed by the employer, plainly satisfy the second prerequisite to a Gissel bargaining order.[16]
 
 
 41
 3. The Appropriateness of the Bargaining Order Remedy
 
 
 42
 The final prerequisite to the issuance of a bargaining order-i.e., the finding that, due to the employer's serious and pervasive unfair labor practices, the possibility of ensuring a fair election is slight and employee sentiment would, on balance, be better protected by a bargaining order-is a determination largely within the special competence of the Board. The Supreme Court noted in Gissel that:
 
 
 43
 It is for the Board and not the courts ... to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies ..., the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.
 
 
 44
 NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969). See also Pedro's, Inc. v. NLRB, 652 F.2d 1005, 1011-12 (D.C.Cir.1981) (remanding case for determination of appropriate remedy after rejecting one unfair labor practice finding).
 
 
 45
 In the present case we cannot say that the Board abused its remedial discretion. First, the litany of unfair labor practices supports the Board's conclusion that "almost from the moment it learned of its employees' support for the Union, (the Company) embarked on an unlawful course of conduct designed to stifle further union activity." John Cuneo, Inc., 253 N.L.R.B. at 1027; see Part II supra. Second, the Board properly considered the relatively small size of the bargaining unit. While the effect of the Company's conduct arguably might have been diluted if it had involved only a small number of employees in a large bargaining unit, the anti-union conduct in this case was highly magnified in a unit limited to fourteen persons. See, e.g., Ann Lee Sportswear, Inc. v. NLRB, 543 F.2d 739, 744 (10th Cir. 1976) (twenty-employee bargaining unit); NLRB v. Scoler's Inc., 466 F.2d 1289, 1291 (2d Cir. 1972) (interrogation of six employees out of nineteen in bargaining unit). Moreover, a majority of the Company's employees was subject to one or more serious unfair labor practices. Cf. NLRB v. Kostel Corp., 440 F.2d 347, 352 (7th Cir. 1971) (threats and interrogations involving three employees in a bargaining unit of five).
 
 
 46
 We therefore uphold the Board's bargaining order. As this court has previously noted: "Gissel does not require a finding that no other remedy could suffice, only that the bargaining order better protects employees' expressed union preference." Amalgamated Clothing Workers v. NLRB, 527 F.2d 803, 807 (D.C.Cir.1975), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). That standard is met here, given the Union's valid card majority in an appropriate bargaining unit and the Company's serious and pervasive unfair labor practices.
 
 B. Retroactivity of the Bargaining Order
 
 47
 The Board concluded that the Company violated section 8(a)(5) of the Act by withholding recognition from the Union on September 16, 1977, and ordered the Company to bargain retroactively from that date. John Cuneo, Inc., 253 N.L.R.B. at 1027. Since its decision in Trading Port, Inc., 219 N.L.R.B. 298 (1975), the Board has consistently made Gissel bargaining orders retroactive, rather than effective only from the date of the Board Decision and Order.[17] The Board adopted this policy upon recognition that prospective bargaining orders
 
 
 48
 (i)n some instances ... left unremedied an employer's unilateral changes in working conditions made after a union had established its majority status.... This led to the unwanted result that an employer, by committing serious unfair labor practices, could delay the holding of an election indefinitely (since a fair one could no longer be held), and insure himself a substantial period of time until the Board issued a remedial bargaining order, during which period he would not have to deal with a union. Since the events which "triggered" the bargaining duty occurred much earlier, i.e., at the time of the unfair labor practices, and since the employees had earlier expressed their desire for union representation, the Board's prospective bargaining order fell short of reinstating the situation as it would have been had Respondent obeyed the law and allowed a fair election to proceed.
 
 
 49
 Trading Port, Inc., 219 N.L.R.B. at 301. Cf. International Union of Electrical, Radio & Machine Workers v. NLRB (Tiidee Products, Inc.), 426 F.2d 1243, 1248-49 (D.C.Cir.) (prospective bargaining order inadequate remedy for "brazen refusal to bargain" after union election victory), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).
 
 
 50
 Three circuits have explicitly considered and enforced retroactive, as opposed to prospective only, bargaining orders. See Alumbaugh Coal Corp. v. NLRB, 635 F.2d 1380, 1386 (8th Cir. 1980); Hedstrom Co. v. NLRB, 629 F.2d 305, 318-19 (3d Cir. 1980) (en banc), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); Ann Lee Sportswear, Inc. v. NLRB, 543 F.2d 739, 744 (10th Cir. 1976). We also approve the issuance of retroactive bargaining orders where, as here, the union had majority support within the bargaining unit, the employer refused to bargain with the union, and the employer engaged in serious and pervasive unfair labor practices sufficient to justify a bargaining order under Gissel. In this case, therefore, the Board was justified in making its bargaining order retroactive to September 16, 1977, the date on which the Union, having attained majority support, demanded recognition and on which the Company rejected the demand and embarked on its course of unlawful conduct.[18]C. Reinstatement of the Striking Employees Under Drug Package
 
 
 51
 In Drug Package Co., 228 N.L.R.B. 108 (1977), the employer rejected a demand for recognition by a union that had a valid card majority. Beginning before the union demanded recognition, and continuing after it, the employer engaged in serious unfair labor practices that undermined the union majority. Two weeks after the union demand, the employees struck for recognition. Relying on its Trading Port decision, the Board issued a bargaining order retroactive to the date that the union evidenced majority support and demanded recognition. The Board further held that the employees who struck for recognition were unfair labor practice strikers and therefore entitled to reinstatement upon their unconditional offer to return to work. Those strikers who had not been promptly reinstated were awarded backpay plus interest.[19] See Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956).
 
 
 52
 The Board relied on its Drug Package decision to characterize the striking employees in the present case as unfair labor practice strikers. On this point, the Board opinion stated: " '(W)hen employees strike for recognition which should have been granted at the time they went on strike and where the employer engaged in contemporaneous widespread illegal conduct designed to frustrate the statutory scheme, and bargaining in particular, the striking employees are unfair labor practice strikers.' " John Cuneo, Inc., 253 N.L.R.B. at 1026 (quoting Drug Package Co., 228 N.L.R.B. at 112). The factual circumstances of Drug Package and of the present case are indistinguishable-in both cases the employer rejected a demand for recognition by a majority union and committed unfair labor practices justifying a Gissel bargaining order; following the employer's rejection, the employees struck for recognition. The propriety of the Board's reinstatement order in this case therefore depends upon the validity of the so-called Drug Package doctrine.
 
 
 53
 In one sense, the treatment of striking employees as unfair labor practice strikers under the circumstances of Drug Package and of this case follows by simple logic from the imposition of a retroactive bargaining order. Concomitant with the imposition of the retroactive bargaining order is a conclusion that the employer's refusal to recognize and bargain with the majority union was a violation of section 8(a)(5). See John Cuneo, Inc., 253 N.L.R.B. at 1027; Drug Package Co., 228 N.L.R.B. at 111 & n.21. Since the employer committed an unfair labor practice in its refusal to recognize the union, and since the employees then struck for recognition, the employees' "absence from the workplace (was) prompted by employer conduct that (was) found to constitute an unfair labor practice," Teamsters Local 115 v. NLRB, 640 F.2d 392, 394 (D.C.Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 119, 70 L.Ed.2d 102, --- U.S. ----, 102 S.Ct. 141, 70 L.Ed.2d 117 (1981). Hence, the employees were unfair labor practice strikers.
 
 
 54
 The logical application of established remedial principles is not the sole justification for the Board's Drug Package doctrine. The Drug Package doctrine is also warranted by well-recognized policies of the Act, which provide both a union and an employer certain limited, lawful options prior to a Board election or a voluntary recognition of a majority union.
 
 
 55
 Under the Act, an employer has no automatic duty to bargain with a union that claims to have signed authorization cards from a majority of the employees in an appropriate bargaining unit. The employer may, regardless of motive, refuse a demand for recognition based on a card majority and compel the union to petition for a secret-ballot election to demonstrate its majority status. Linden Lumber Division v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). An employer who rejects a demand for recognition may not, however, use the time preceding the election to commit unfair labor practices in an attempt to destroy the union's majority. Linden Lumber Division v. NLRB, 419 U.S. at 310, 95 S.Ct. at 434; NLRB v. Gissel Packing Co., 395 U.S. 575, 600, 89 S.Ct. 1918, 1933, 23 L.Ed.2d 547 (1969). If the employer engages in unlawful conduct that impedes the electoral process, the employer "forfeits (its) right to demand an election," NLRB v. Prineville Stud Co., 578 F.2d 1292, 1296 (9th Cir. 1978), and may be ordered to bargain with the union, NLRB v. Gissel Packing Co., 395 U.S. at 614-15, 89 S.Ct. at 1940. See Amalgamated Clothing Workers v. NLRB, 527 F.2d 803, 806 n.4 (D.C.Cir.1975), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); Drug Package Co., 228 N.L.R.B. at 111.
 
 
 56
 If the employer refuses to bargain on the basis of the union's card majority, the union may strike for recognition, subject to the restrictions of section 8(b)(7)(C) of the Act. 29 U.S.C. § 158(b)(7)(C) (1976).[20] The union may hope that a visible display of majority support on the picket line and economic pressure on the employer will shorten the route to recognition and bargaining. Still, as long as the employer does not unlawfully attempt to undermine the union's support, it is not required to recognize the union and may insist on an election. See Linden Lumber Division v. NLRB, 419 U.S. at 306, 95 S.Ct. at 432. In addition, the employer may permanently or temporarily replace employees engaged in an economic strike. See text accompanying notes 10-12 supra.
 
 
 57
 If the employer exceeds its legal rights and embarks on an unlawful campaign to undermine the union's support, it may injure the employees' protected interests in at least two distinct ways. First, the employer's unfair labor practices may prevent the employees from freely expressing their union preferences in a Board conducted election. An impairment of employee free choice, assured by section 7 of the Act, 29 U.S.C. § 157 (1976), may justify the imposition of a Gissel bargaining order. As the Board stated in Drug Package : "The legal basis for so bypassing the election procedure is simply that the employer's own misconduct has created conditions which now preclude the conducting of a fair election." 228 N.L.R.B. at 111.
 
 
 58
 Second, the employer's illegal conduct may cause excessive economic harm to employees who have participated in a lawful strike for recognition. As noted above, when a union demands recognition, the employer has two lawful options. The employer may recognize and bargain with the union, in which case no strike for recognition will follow. Alternatively, the employer may refuse to recognize the union and await the outcome of a Board election. If the employer does not impede the electoral process, the recognitional strike should last no longer than the date of the election.[21] If, however, the employer rejects these lawful alternatives and undermines or prevents an election, the strike likely will be prolonged as a consequence of activity that is clearly forbidden by the Act. In other words, the employees' continued strike, and continued loss of earnings, would result directly from their employer's illegal conduct.
 
 
 59
 Just as a Gissel bargaining order may be an appropriate remedy for the impairment of employee free choice caused by an employer's unfair labor practices, the treatment of striking employees as unfair labor practice strikers under Drug Package may be an appropriate remedy for the harm that follows from an employer's illegal conduct. Furthermore, the possibility that striking employees might attain the status of unfair labor practice strikers under Drug Package may deter an employer from embarking on a course of illegal conduct designed to destroy a union's majority. See Peoples Gas System, Inc. v. NLRB, 629 F.2d 35, 50 (D.C.Cir.1980) (deterrence is a legitimate remedial purpose of bargaining orders). Thus, the Board's characterization of these striking employees as unfair labor practice strikers "bear(s) appropriate relation to the policies of the Act." NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 348, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953).
 
 
 60
 Finally, the Board's Drug Package doctrine is appropriately remedial and not improperly punitive.[22] If an employer engages in serious and pervasive unfair labor practices that prevent a fair election, the employer may extend a lawful recognitional strike beyond the date on which, by operation of the lawful election process, it would have terminated. Thus, the Board may properly conclude that the employees would not be "made whole" for their employer's unfair labor practices if they were not entitled to prompt reinstatement after their unconditional offers to return to work. See International Union of Electrical, Radio & Machine Workers v. NLRB, 604 F.2d 689, 697 (D.C.Cir.1979). Similarly, the Board may properly conclude that the employer has forfeited its right to hire permanent replacements for its striking employees when their absence from work stems from the employer's unlawful impairment of the electoral process. See, e.g., M. H. Ritzwoller Co. v. NLRB, 114 F.2d 432, 437 (7th Cir. 1940). The Drug Package doctrine therefore lies within the broad remedial discretion that Congress gave to the Board, 29 U.S.C. § 160(c) (1976), and which the courts have recognized, e.g., Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); United Steelworkers v. NLRB, 646 F.2d 616, 629-30 (D.C.Cir.1981), and we affirm it.[23]
 
 
 61
 As we noted earlier, the facts of this case are indistinguishable from those of Drug Package. The Union demanded recognition based on a valid card majority. The Company refused and embarked on an unlawful course of conduct designed to destroy the Union's majority. The Union then unsuccessfully struck for recognition. After considering the employer's conduct, the Board concluded that a retroactive bargaining order should issue. We therefore uphold the Board's decision, based on Drug Package, to view the striking employees as unfair labor practice strikers, whom the Company therefore had an obligation to reinstate upon their unconditional offers to return to work on November 14, 1977.
 
 IV. CONCLUSION
 
 62
 For the reasons set forth above, we affirm the Board's findings of fact and conclusions of law and deny the petitions for review. We grant enforcement of the Board's Order in full.
 
 
 63
 So ordered.
 
 
 
 [1]
 The summary of the facts underlying these consolidated cases is drawn from the Decision and Order of the Board and from the Decision of the Administrative Law Judge. John Cuneo, Inc., 253 N.L.R.B. 1025 (1981). Following a careful review of the record, we hold that these factual findings are supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [2]
 Hall first read and signed a statement attesting only that he was a supervisor. Supervisor Izell later presented another statement to Hall. Izell told Hall that some words had been added reflecting that Hall might have influenced employees to sign the union authorization cards. Hall signed the second statement without reading it
 The Company lost the first statement and introduced only the second statement into evidence in the Board proceedings. The second statement clearly states that Hall had encouraged employees to sign authorization cards. In his testimony before the Administrative Law Judge ("A.L.J."), however, Hall denied encouraging any employee to sign an authorization card. The A.L.J. credited Hall's and the other employees' testimony rather than the second statement.
 
 
 [3]
 One of the seven striking employees offering to return to work was Michael Green, who was ineligible for reinstatement due to his discharge for cause in October. Thus, the other six striking employees who sought reinstatement were the focus of the Board's concern about reinstatement. See Part II-C infra
 
 
 [4]
 The Company originally petitioned for review in the United States Court of Appeals for the Sixth Circuit. Its petition was transferred to this court by Order of the Sixth Circuit on June 19, 1981
 
 
 [5]
 The court has jurisdiction pursuant to sections 10(e) and 10(f) of the Act. 29 U.S.C. § 160(e), (f) (1976)
 
 
 [6]
 The Board dismissed the portions of the complaint concerning Green's discharge after his return to work and the alleged interrogation of another employee, Gregg. Serious picket line misconduct, of course, may serve to waive a striking employee's right to reinstatement. E.g., NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939). The Board's conclusion in this case that Green's misconduct, plus his unexplained early departure from work, were serious enough to warrant discharge is legally justified. We therefore decline to set it aside
 The Union argues that the reasons given for Green's discharge were merely pretextual and disguised an anti-union motivation. The only evidence supporting this argument, however, was the testimony of employee Gregg. The A.L.J. discredited Gregg's testimony, and we can find no basis upon which to overrule the A.L.J.'s credibility determination. See, e.g., Truck Drivers Local 705 v. NLRB, 509 F.2d 425, 426 (D.C.Cir.1974) (per curiam); International Bhd. of Teamsters v. NLRB, 435 F.2d 416, 417 (D.C.Cir.1970) (per curiam). Similarly, the only evidence supporting the dismissed interrogation charge was Gregg's own discredited testimony. Lacking any sound reason to question the A.L.J.'s credibility findings, we refuse to set aside the Board's dismissal of these two unfair labor practice charges.
 
 
 [7]
 Even if the Company erroneously believed that Hall was a supervisor, its interrogations and threat violated § 8(a)(1). The employer's intent to interfere with employee rights is not a necessary element of the unfair labor practice. E.g., NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). As the First Circuit recognized, "(t)he right of employees to engage in activity guaranteed by Section 7 of the Act should not be subject to defeasance merely because the employer believes he is not violating the Act in restraining the employee in his exercise of such rights." NLRB v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941, 945-46 (1st Cir. 1961)
 
 
 [8]
 The Company claims that it took pictures in order to identify picket line misconduct and points to the identification of Green as one of the pursuers of two replacement employees. The photographs, however, were taken of peaceful picketing, and the employees were not informed of the allegedly limited purpose. In addition, in one case photographs were taken over three weeks after the only reported incident of picket line misconduct. In these circumstances, we agree with the Board's judgment that the photographs had an inherent tendency to interfere with the exercise of protected employee rights. See Kallmann (Love's Barbeque Restaurant No. 62 ), 245 N.L.R.B. 78, 124 (1979), enforced in relevant part, 640 F.2d 1094, 1098 (9th Cir. 1981)
 The Company also claims that the photographs were taken for the purpose of filing unfair labor practice charges against the Union under §§ 8(b)(4)(B) and 8(b)(7)(C) of the Act, 29 U.S.C. § 158(b)(4)(B), (b)(7)(C) (1976). The Board properly rejected this claim as well. The Company withdrew its § 8(b)(4) charge, and the § 8(b)(7) charge lacked merit because the Union had filed a timely representation petition.
 
 
 [9]
 The Company's refusals to recognize the Union on September 16 and again on September 21 were not by themselves unfair labor practices. As long as the Company did not commit other unfair labor practices that impaired the electoral process, it had the right to refuse recognition and to demand that the Union petition for an election to demonstrate its majority status. Linden Lumber Div. v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974)
 
 
 [10]
 Our sole concern here is whether the Company committed any unfair labor practices with respect to the reinstatement of the striking employees. We therefore consider whether the Company accorded its employees the reinstatement rights of economic strikers. In Part III-C infra our concern is the appropriate remedy, not only for the Company's failure to properly reinstate economic strikers, but for all of the Company's unfair labor practices. See Part III-C infra
 
 
 [11]
 Two economic strikers-both of whom had offered to return on November 14-were recalled to work on February 1. Two other employees were reinstated on February 20 and June 23. The two remaining employees who had sought to return to work had not been reinstated as of the time of the A.L.J. hearing in September 1978. The Company's exhibits reveal a number of vacancies prior to that time
 
 
 [12]
 Because of the Company's failure to prove the absence of available vacancies, and because of the Board's remedial order in the case, which we approve, it is unnecessary to ascertain the exact dates of available vacancies. It suffices that the striking employees were not offered timely reinstatement and that the Company therefore repeatedly violated the Act
 
 
 [13]
 Throughout this opinion, "Gissel bargaining order" refers to the second category of bargaining orders mentioned in the Gissel opinion-those orders issued after an employer's unfair labor practices undermine a union's majority strength. See NLRB v. Gissel Packing Co., 395 U.S. at 613-15, 89 S.Ct. at 1939-40
 
 
 [14]
 The fact that Union representatives told employees that the cards might also be used to obtain a Board election does not preclude their use to establish employee support for the Union. The Supreme Court explained in Gissel Packing :
 (E)mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election. Elections have been, after all, and will continue to be, held in the vast majority of cases; the union will still have to have the signatures of 30% of the employees when an employer rejects a bargaining demand and insists that the union seek an election.
 395 U.S. at 606-07, 89 S.Ct. at 1936 (footnote omitted).
 
 
 [15]
 The Company also contends that the cards were improperly obtained through the influence of a Company Supervisor, Gerald Hall, and hence cannot be considered as representative of employee sentiment. We need not consider this argument, since we have upheld the Board's determination that Hall was an employee, not a supervisor. See Part II-A supra
 Finally, we note that NLRB v. Keystone Pretzel Bakery, Inc., 674 F.2d 197 (3d Cir. 1982), which the Company submitted for our consideration after oral argument in this case, is clearly distinguishable. Even if we were to accept the Third Circuit's position that the General Counsel must prove that each employee read the authorization card before signing it, id. at 201-02; but cf. NLRB v. Gissel Packing Co., 395 U.S. at 608, 89 S.Ct. at 1937 ("We ... reject any rule that requires a probe of an employee's subjective motivations." ), that requirement was satisfied here. The A.L.J. in this case found that the employees read the authorization cards, John Cuneo, Inc., 253 N.L.R.B. at 1031, and there is no evidence that any statements by Union representatives contradicted the plain language of the cards.
 
 
 [16]
 As was aptly noted in NLRB v. Sitton Tank Co., 467 F.2d 1371, 1372 (8th Cir. 1972) (per curiam): "The surest method of undermining a union's majority or impeding an election process is to discharge all the pro-union employees ...."
 
 
 [17]
 In Trading Port the Board overruled the prospective-only bargaining order policy it had announced in Steel-Fab, Inc., 212 N.L.R.B. 363 (1974)
 
 
 [18]
 The Union achieved majority status on September 15, one day before it demanded recognition. The Board and the courts have followed the rule that bargaining orders are retroactive to the later of the date on which the union achieved majority status and the date on which the employer commenced its unfair labor practices. See, e.g., Alumbaugh Coal Corp. v. NLRB, 635 F.2d 1380, 1386 (8th Cir. 1980) (bargaining order retroactive to date union obtained majority support where unfair labor practices began earlier); NLRB v. Eagle Material Handling, Inc., 558 F.2d 160, 168 (3d Cir. 1977) (bargaining order retroactive to date employer commenced unlawful conduct where union earlier had majority support); Drug Package Co., 228 N.L.R.B. 108, 111 (1977), enforced in part, 570 F.2d 1340 (8th Cir. 1978); Frito-Lay, Inc., 232 N.L.R.B. 753, 755 n.8 (1977), enforced in part, 585 F.2d 62 (3d Cir. 1978). This rule is grounded on the dual requirements of union majority status and serious employer unfair labor practices before a Gissel bargaining order may issue. See NLRB v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969); cf. Struthers-Dunn, Inc. v. NLRB, 574 F.2d 796 (3d Cir. 1978) (bargaining order inappropriate where union lost majority support before employer commenced unfair labor practices)
 Because the Union demanded recognition in this case, we need not decide whether a retroactive bargaining order may issue in the absence of such a demand. See, e.g., NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc., 585 F.2d 79 (3d Cir. 1978); Beasley Energy, Inc. (Peaker Run Coal Co.), 228 N.L.R.B. 93 (1977). Further, because the Union's demand for recognition in this case was made on the same day that the Company embarked on its unlawful course of conduct, we need not decide whether a bargaining order may be made retroactive to a date prior to the demand for recognition if the union's majority status and the employer's unfair labor practices antedated the demand for recognition. See, e.g., Cas Walker's Cash Stores Inc., 249 N.L.R.B. 316 (1980), enforced, 659 F.2d 79 (6th Cir. 1981); Albertson Mfg. Co., 236 N.L.R.B. 663 (1978). See generally Walther & Douglas, NLRB Bargaining Orders: A Problem-Solving or Ivory Tower Approach to Labor Law?, 17 Washburn L.J. 1, 12-25 (1977).
 
 
 [19]
 The Eighth Circuit denied enforcement of the retroactive bargaining order. Drug Package, Inc. v. NLRB, 570 F.2d 1340 (8th Cir. 1978). The court held that enforcement would have been unfair to the employer in that case because the employer's conduct and the A.L.J. hearing in Drug Package both antedated the Board's Trading Port decision and because the NLRB General Counsel had not fully litigated a § 8(a)(5) charge. The Eighth Circuit has since enforced retroactive bargaining orders where these concerns were not present. Alumbaugh Coal Co. v. NLRB, 635 F.2d 1380, 1386 (8th Cir. 1980). The Company cannot make a similar claim of unfairness here
 
 
 [20]
 Under § 8(b)(7)(C) a union may not engage in recognitional picketing for an unreasonable time, not to exceed thirty days, without filing a representation petition with the Board. Thus, § 8(b)(7)(C) also channels the parties toward the use of a Board election to settle unresolved representation disputes
 
 
 [21]
 Once the election is held and the recognitional dispute resolved, no reason exists for the recognitional strike to continue. Moreover, § 8(b)(7)(B) of the Act prohibits recognitional picketing "where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted." 29 U.S.C. § 158(b)(7)(B) (1976)
 If the union wins the election, the employees may, of course, strike in support of economic demands in collective bargaining. This is not the same, however, as a strike in response to employer misconduct. Also, the costs suffered by employees pursuant to a strike to enforce bargaining demands are costs that are plainly anticipated by the scheme of collective bargaining imposed by the Act.
 
 
 [22]
 We express no opinion about application of the Drug Package doctrine to cases in which the recognitional strike antedates the employer's refusal to bargain or in which the employer's unfair labor practices begin long after the employees' unconditional offers to return to work. See note 18 supra. We assume that the Board will apply Drug Package in different cases judiciously, keeping in mind that its orders may not be punitive. E.g., Republic Steel Corp v. NLRB, 311 U.S. 7, 11-12, 61 S.Ct. 77, 79-80, 85 L.Ed. 6 (1940)
 
 
 [23]
 The Board summarized its Drug Package doctrine as: "(W)hen employees strike for recognition which should have been granted at the time they went on strike and where the employer engaged in contemporaneous widespread illegal conduct designed to frustrate the statutory scheme, and bargaining in particular, the striking employees are unfair labor practice strikers." Drug Package Co., 228 N.L.R.B. at 112 (footnote omitted), quoted in John Cuneo, Inc., 253 N.L.R.B. at 1026. The Board's phrase "recognition which should have been granted at the time (the employees) went on strike" might be subject to misinterpretation, but we do not believe it represents a flaw in the Board's enunciation and application of the Drug Package doctrine. When read in context, it is clear that the Board fully recognizes the holding of Linden Lumber that an employer who commits no unfair labor practices has no obligation to recognize a union without an election to demonstrate the union's majority status. Rather than suggesting some duty on the part of an employer, acting within its lawful rights, to recognize a union without a representation election, we read this language as applying to an employer who has committed serious unfair labor practices and thus forfeited its right to a Board election